# United States Court of Appeals for the Federal Circuit

06-5007

TEG-PARADIGM ENVIRONMENTAL, INC.,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Robert C. Haase, Jr., Robins, Kaplan, Miller & Ciresi L.L.P., of Los Angeles, California, argued for plaintiff-appellant. With him on the brief was Edward D. Lodgen. Of counsel was David C. Veis.

Andrew P. Averbach, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Donald E. Kinner, Assistant Director.

Appealed from:   United States Court of Federal Claims

Judge Nancy B. Firestone

# United States Court of Appeals for the Federal Circuit

06-5007

TEG-PARADIGM ENVIRONMENTAL, INC.,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

—————————————————

DECIDED:  September 29, 2006

—————————————————

Before MICHEL, Chief Judge, RADER, and SCHALL, Circuit Judges.

SCHALL, Circuit Judge.

TEG-Paradigm Environmental, Inc. ("TEG") entered into a contract with the United States Department of Housing and Urban Development ("HUD").  Pursuant to the contract, TEG agreed to perform asbestos abatement work at the Geneva Towers, an apartment complex, in San Francisco.  After the contract work was completed, TEG submitted a claim to the contracting officer in which it sought an equitable adjustment in the contract price.  In support of its claim, TEG asserted that it had been required to perform excessive cleaning and that it had been required to remove excessive

quantities of asbestos. After the contracting officer denied the claim, TEG filed suit in the United States Court of Federal Claims under the Contract Disputes Act of 1978, 41 U.S.C. §§ 601-613 (2000).

TEG's complaint in the Court of Federal Claims contained three counts. In Count One, TEG alleged breach of contract based upon HUD not permitting TEG to perform the contract work in accordance with its original work plan. In Count Two, TEG alleged that HUD breached the contract by requiring what it characterized as extraordinary and unnecessary cleaning of the surfaces of the buildings. Finally, in Count Three, TEG alleged that it was entitled to additional compensation under the contract based upon its removal of excessive quantities of asbestos. TEG sought a combined breach of contract and equitable adjustment recovery in the amount of approximately $4 million.

In due course, the parties filed cross-motions for summary judgment. The court granted summary judgment for the government on Counts One and Two of the complaint and for TEG on Count Three of the complaint. TEG-Paradigm Envtl., Inc. v. United States, No. 00-507C, slip op. at 26 (Fed. Cl. Aug. 30, 2002). TEG now appeals from the court's decision granting the government's motion for summary judgment on its two claims of breach of contract. Finding no error in the Court of Federal Claims's decision, we affirm.[1]

BACKGROUND

I.

The Geneva Towers were two high-rise apartment buildings in San Francisco. HUD acquired the buildings in 1991 and decided to implode them to make way for new

---

[1] The government has not cross-appealed the court's grant of summary judgment in favor of TEG on Count Three.

development.  Id., slip op. at 2.  However, the buildings contained asbestos, which had to be removed before implosion.  Id.  HUD solicited bids on a contract for asbestos abatement and TEG was awarded the contract on May 8, 1997, for a fixed price of $5,153,625.00.  The contract required that the abatement be complete on or by December 31, 1997, and provided for liquidated damages of $5,000 per day of delay.  After several extensions, the deadline for finishing the abatement was changed to February 15, 1998.  Id., slip op. at 7.  However, TEG did not finish the abatement work until March 31, 1998, causing HUD to assess $220,000 in liquidated damages against it.  Id., slip op. at 8.  This delay was purportedly caused at least in part by disagreements between TEG and HUD over contract requirements.  Specifically, the parties disagreed as to (i) whether the contract required TEG to abate asbestos in the pores and cracks of the Geneva Towers' surfaces and (ii) whether TEG was required to comply with the contract specifications rather than TEG's work plan.

A.

We begin with the facts relevant to the first point of contention between the parties, which concerns the level of asbestos abatement required by the contract (Count Two of the complaint).

The original contract specifications provided two separate abatement standards, one for friable and one for non-friable asbestos-containing materials.  Friable materials are capable, when dry, of being crumbled, pulverized, or reduced to powder by hand pressure.  Id., slip op. at 2.  The original asbestos abatement standard was set forth at Section 2080, 4.3C of the contract, which provided as follows:

> Friable materials applied to concrete, masonry, wood and nonporous surfaces, including but not limited to, steel

> structural members (decks, beams and columns), pipes and tanks, shall be cleaned to a degree that no traces of debris or residue are visible. Nonfriable materials applied to concrete, masonry, [or] wood shall be cleaned until no residue is visible other than that which is embedded in the pores, cracks, or other small voids below the surface of the material.

Thus, the original specifications established a stringent visibility standard for friable materials and a less stringent standard, one which allowed the contractor to leave asbestos in the pores and cracks, for non-friable materials. The original Section 2080, 4.3C likely provided the stringent visibility standard for friable asbestos-containing materials because they are more likely to become airborne and thus pose a health risk.

In the course of the bidding process, prospective bidders, including TEG, raised questions about which standard applied to the concrete on the exterior of the buildings. During a conference call concerning the prospective contract, TEG's representative noted, "It's a significant difference, because on one it has to be clean to a degree there's no trace; on the other, it's clean to a degree that material can still be embedded in pores, cracks and voids."

In response to the questions raised during the bidding process about the original asbestos abatement standard, the government modified the standard. The revised section 2080, 4.3C set forth a single standard for all asbestos-containing materials and provided as follows:

> Asbestos-containing materials applied to concrete, masonry, wood and nonporous surfaces, including, but not limited to, steel structural members (decks, beams and columns), pipes and tanks, shall be cleaned to a degree that no traces of debris or residue are visible by the Observation Services Contractor.

Thus, the revised Section 2080, 4.3C abolished the old standard applicable for non-friable materials that stated that it was acceptable to leave asbestos-containing materials in pores and cracks. Instead, a standard requiring that there be no visible asbestos, similar to the original standard for friable asbestos-containing materials, was adopted for all asbestos-containing materials.[2]

As noted by the Court of Federal Claims, trade practice and custom in the asbestos abatement field includes presuming that any "debris and residue" contains asbestos. Id., slip op. at 13. The court based its finding on the American Society for Testing Material ("ASTM") standard for asbestos abatement, which provides, "Any residue, dust, or debris found during the inspections is assumed to contain asbestos . . . ." Id.

---

[2] In a joint status report, the government provided an explanation for why the stringent visibility standard was adopted for both friable and non-friable materials. The government stated that

> asbestos is a carcinogenic substance and is regulated under the National Emission Standards for Hazardous Air Pollutants (NESHAP), promulgated by the EPA under the Clean Air Act at 40 CFR 61.145(c)(1). The NESHAP required that all friable [asbestos-containing materials (ACM)] be removed prior to demolition of a regulated structure. . . . Non-friable ACM may be left in place prior to demolition by standard techniques such as a wrecking ball. However, allowing non-friable ACM to remain in a building prior to an implosion was considered to be a gray area of the regulation that may be impermissible due to the possibility that the ACM could become friable under such circumstances.

B.

The parties' second disagreement concerns whether the contract's specifications or TEG's work plan controlled the terms of TEG's performance (Count One of the complaint).

Section C of the contract specifications states that the contractor will provide a work plan for approval. The relevant portion of Section C provides:

> Contractor[']s Work Plan: Submit for approval a detailed plan of engineering controls and the work procedures to be used in the removal, repair, clean-up or encapsulation of materials containing Asbestos.
> 1. For all projects submit:
>     a. Names of Superintendent, Foremen, Project Manager and other key personnel, and their day time and emergency telephone and pager numbers.
>     b. Detailed description of the method to be employed in order to control pollution, including negative air equipment calculations.
>     c. Personal air monitoring procedures.
>     d. Safety Plan in accordance with Contract Document requirements.
>        (MATERIAL OMITTED)
>     e. Location of Asbestos Work Areas.
>     f. Layout and construction details of Decontamination Enclosure Systems.
>     g. Project schedule including important milestones, critical paths and interface of trades involved in the Work.
>     h. Security Plan including sketches necessary to clearly describe the plan.
>     i. Emergency evacuation plan for injured workers, compressor failure, fire and other emergencies.
>     j. Firewatch Plan including names, telephone and pager numbers, and qualifications of personnel, firewatch duties, sketches necessary to clearly describe the plan and, when applicable, specific requirements of local building/fire department regulations.
>     k. A contingency plan, in the event of a major contamination incident caused by fire (on or off the floor being abated), a large breech in the Work area containment barrier, the opening of stairwell doors,

> breakage of the buildings['] exterior windows or sabotage. Such a plan will focus on how to maintain safety and order when the building is occupied by building occupants, the public and other building users.

Pursuant to this provision, HUD requested that TEG submit its work plan on April 21, 1997. On April 25, 1997, TEG submitted a first version of its work plan. In response to deficiencies pointed out by HUD and ATC Associates, Inc. ("ATC"), HUD's asbestos engineer and technical advisor for the contract, TEG revised the work plan several times in late April and early May of 1997. Two weeks after the initial submittal of the work plan, TEG was awarded the contract.

Disputes arose during contract performance as to whether the work plan or the contract specifications governed performance. TEG pointed out discrepancies between the two documents in a letter dated June 17, 1997. For example, TEG noted in the letter that it had not closed vertical pipe cavities, as required by the specifications, because the work plan required the cavities to remain open in order to complete the project. The discrepancies between the work plan and the contract specifications led to the issuance of a Stop Work Order. After over a month of disputes, HUD accepted a Value Engineering Change Proposal ("VECP")[3] from TEG that made changes to the contract specifications to bring it more in line with the work plan. Work then continued under the revised specifications.

---

[3]  A VECP is a contractor's proposal to make a cost-reducing change to a government contract. See 48 C.F.R. §§ 48-201, 52.248-1–.248-3 (2006); see also John Cibinic, Jr., Ralph C. Nash, Jr. & James F. Nagle, Administration of Government Contracts 409 (4th ed. 2006).

II.

The Court of Federal Claims issued an opinion on August 30, 2002, evaluating the parties' cross-motions for summary judgment. The court outlined three issues before it, corresponding to each of TEG's three claims: (i) whether the contract required the removal of asbestos residue in pores and cracks; (ii) whether TEG was required to follow the contract specifications rather than its work plan; and (iii) whether TEG was entitled to compensation for removing what it alleged were excessive quantities of asbestos. Id., slip op. at 10.

The court began with the issue of the removal of asbestos residue from the pores and cracks in the surfaces of the Geneva Towers. Id., slip op. at 10-16. The court noted that the language of the contract required that "[a]sbestos-containing materials applied to concrete, masonry, wood and nonporous surfaces . . . shall be cleaned to a degree that no traces of debris or residue are visible." Id., slip op. at 11. Based on this language, the court identified two issues to be decided. First, it had to decide if the contract required the removal of asbestos within pores and cracks. Second, it had to determine what asbestos-containing "debris or residue" meant.

Beginning with whether the contract required the cleaning of pores and cracks, the court found that any asbestos-containing material "applied to" a porous surface would necessarily enter any pores or cracks. Thus, it found that pores and cracks were in fact part of the surface of the material. Id., slip op. at 12. Further, the court reasoned that asbestos-containing material could be visible within pores or cracks. Id. Therefore, the court concluded, the contract required that the pores and cracks of the porous

surfaces of the Geneva Towers be cleaned of all visible traces of asbestos.  Id., slip op. at 13.

Turning to the question of what asbestos-containing "debris or residue" meant, the Court of Federal Claims found that there was no definition in the contract.  Industry standards clarified, however, that any residue, dust, or debris found during an inspection was assumed to contain asbestos.  Id.  Thus, the court reasoned, TEG was required to remove any residue, dust, or debris found.  The court concluded that the contract required that TEG remove all material containing more than 1% asbestos and that TEG remove all visible traces of asbestos, including materials recessed in pores or cracks.  Accordingly, the court granted summary judgment in favor of the government on the abatement standard issue.  Id., slip op. at 16.

Addressing the issue of whether TEG's work plan or the contract specifications governed TEG's performance, the Court of Federal Claims noted that the parties agreed that there were conflicting provisions of the work plan and the contract specifications.  Id., slip op. at 21.  Continuing, the court pointed out that one of the reasons for requiring strict compliance with contract specifications is to prevent low bidders from using substandard materials.  Id., slip op. at 22.  The court also pointed out that the government awards contracts to those bidders whose bid "conforms to the specification."  Id., slip op. at 23.  The court found that generally the purpose of contract work plans is to enable the government to determine whether or not the contractor is able to perform.  Id., slip op. at 24 (citing John Cibinic, Jr. & Ralph C. Nash, Jr., Formation of Government Contracts 405-06 (3d ed. 1995)).  Further, the court noted that when sealed bids are used, as was the case with the Geneva Towers contract, the

contract cannot be modified after bids are received; the only criterion for contract award other than the bid's responsiveness to the specifications is bidder responsibility. Id., slip op. at 24. The Court of Federal Claims reasoned that if, as TEG argued, HUD had negotiated to replace the conflicting portions of the contract specifications with TEG's work plan, then it would have been violating these rules governing contracts made through the solicitation of sealed bids and the contract would be void. Id., slip op. at 25. The court concluded that the work plan was not incorporated into the contract. Id., slip op. at 25-26. The court therefore denied TEG's motion for summary judgment and granted the government's cross-motion on the work plan issue. Id., slip op. at 26.

Finally, the Court of Federal Claims granted summary judgment in favor of TEG on its claim, in Count Three of the complaint, that it was entitled to an equitable adjustment in the contract price by reason of having removed excessive quantities of asbestos. As seen, the government has not appealed the court's grant of summary judgment on the "[e]xcess quantities" claim. TEG appeals the court's grant of summary judgment in favor of the government on the breach of contract claims in Counts One and Two of the complaint. We have jurisdiction over TEG's appeal pursuant to 28 U.S.C. § 1295(a)(3).

DISCUSSION

I.

Under Court of Federal Claims Rule 56(c) summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Castle v. United States, 301 F.3d 1328, 1336 (Fed. Cir. 2002). We review the grant of summary judgment by the Court of Federal Claims de

novo. <u>Barron Bancshares, Inc. v. United States</u>, 366 F.3d 1360, 1368 (Fed. Cir. 2004). Contract interpretation is a question of law, which we also review de novo. <u>Id.</u>

II.

On appeal, TEG argues that the Court of Federal Claims erred in holding that HUD applied the proper cleaning standard for abatement under the contract. TEG argues that the contract at Section 2080, 4.3C required that asbestos-containing materials be cleaned from "surfaces" so that no traces of debris or residue were visible. TEG contends that "surfaces" are not defined in the contract, but that from common usage dictionaries it is apparent that that they include only "[t]he outer-face, outside, or exterior boundary of a thing; outermost or uppermost layer or area." Appellant's Br. at 21 (quoting a definition found in <u>Random House Webster's College Dictionary</u> 1314 (2d ed. 1999)). TEG argues that the pores and cracks are not part of the "surface" because they are not on the "outer-face" of the concrete. Industry definitions of "debris" and "residue" refer to visible particles that have settled in a work area or on an abated "surface." Thus, TEG argues, the dust in the pores and cracks of the concrete of the buildings was not "debris" or "residue" on a "surface" and therefore not required to be removed.

TEG supports its argument by pointing to what it says was HUD's own interpretation of the contract. First, TEG argues that even HUD recognized that its Observation Services Contractor, Kellco Environmental Services, Inc. ("Kellco"), which was responsible for observing the abatement process, enforced the visibility standard of Section 2080, 4.3C in a "fanatical" way by requiring abatement of asbestos in the pores and cracks. TEG points to an email authored by a HUD employee in which Kellco is

described as having interpreted "what the contract says on a fanatical mode." Second, TEG recites a portion of a letter to HUD from ATC, which purported to clarify the visual inspection standard set forth in Section 2080, 4.3C. ATC stated in the letter that "[r]esidue recessed within the pores and cracks of the concrete substrate is not expected to be extracted." Third, TEG draws attention to a letter from HUD stating that HUD had gone beyond federal standards for asbestos abatement on the Geneva Towers project as well as deposition testimony to the same effect. In addition, TEG claims that the court erred by failing to consider several pieces of evidence including the ATC opinion and an expert opinion rendered by Andrew F. Oberta, the Task Group Chairman of the ASTM Committee on Asbestos Management, to the effect that it would be unreasonable to require a contractor to "chisel or grind away concrete to extract . . . imbedded material even if it was asbestos containing material." Mr. Oberta further opined that he did not believe that the contract required abatement beyond industry standards.

TEG also argues that the government interfered with its work plan, which was a part of the contract. In support of its argument, TEG points out that the work plan was physically attached by HUD to the contract. Further, TEG contends that under Federal Acquisition Regulation ("FAR") § 14.201-1(c), see 48 C.F.R. § 14.201-1(c) (2006), the work plan, which is a representation or a statement of a bidder, was incorporated into the contract. TEG also contends that it was required to proceed under the work plan under FAR § 1552.211-74, 48 C.F.R. § 1552.211-74 (2006), and that therefore the work plan was part of the contract. The Court of Federal Claims erred, TEG argues, in finding that the work plan merely required that the contractor provide certain information

because the contract itself required that the work plan comprise "a detailed plan for engineering control and the work procedures to be used." The Court of Federal Claims's reliance on the Cibinic and Nash government contracts treatise was misplaced, TEG contends, because the section cited by the court pertained to the determination of a contractor's responsibility and not its work plan.

The government defends the Court of Federal Claims's interpretation of the contract's provisions concerning the level of abatement, arguing that the contract's plain language requires abatement of all traces of visible debris and residue. In support of this interpretation, the government notes that Section 2080, 4.3C was amended to exclude any distinction between the abatement standard for friable and non-friable materials. The revised section eliminated provisions that allowed non-friable materials to remain in pores and cracks and instead applied a visibility standard to all asbestos-containing materials. The government argues that even if we accept TEG's arguments concerning the abatement of asbestos on "surfaces," the contract requires abatement of all asbestos that has been <u>applied to</u> surfaces, including asbestos that seeps into pores and cracks after application to the surfaces. The evidence presented by TEG concerning trade usage and custom should be disregarded, the government urges, because it is not directed to interpreting a particular term, but rather the abatement standard as a whole. Additionally, the government contends that trade usage cannot create an ambiguity in an otherwise unambiguous contract. The government also argues that the court did not err by not considering the ATC opinion and Mr. Oberta's opinion because these sources could not be used to contradict the plain meaning of the contract.

The government argues that the Court of Federal Claims correctly found that the work plan was not incorporated into the contract. The government notes that in order for a document to be incorporated into a contract, there must be an express reference in the incorporating document. Although sections J and K of the contract incorporated certain materials by reference, they did not incorporate the work plan, the government notes. The work plan, the government argues, was merely a pre-award submittal that was meant to show that TEG was capable of doing the work. The government claims that this is demonstrated by the fact that HUD never approved the work plan. Even if the work plan had been approved, the government contends, that approval would not have waived compliance with the contract specifications. The government argues that if we were to hold that the work plan trumped the contract itself, we would be allowing bidders to underbid competitors and then use non-conforming sub-par materials and procedures. The government also argues that FAR §§ 14.201-1(c) and 1552.211-74, which were cited by TEG for the proposition that external documents are incorporated into government contracts, are not applicable to work plans. See 48 C.F.R. §§ 14.201-1(c), 1552.211-74. Finally, the government urges that TEG's efforts to have parts of its work plan incorporated into the contract through the VECP show that the work plan was not incorporated into the contract; it would have been unnecessary to have the contract modified through the VECP if the work plan were already a part of the contract.

III.

When interpreting a contract, "'the language of [the] contract must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances.'" Metric Constructors, Inc. v.

Nat'l Aeronatics & Space Admin., 169 F.3d 747, 752 (Fed. Cir. 1999) (quoting Hol-Gar Mfg. Corp. v. United States, 351 F.2d 972, 975 (Ct. Cl. 1965)). When deriving this meaning, we begin with the contract's language. Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (en banc). When the contract's language is unambiguous it must be given its "plain and ordinary" meaning and the court may not look to extrinsic evidence to interpret its provisions. Id. at 1040; McAbee Constr., 97 F.3d at 1435. Although extrinsic evidence may not be used to interpret an unambiguous contract provision, we have looked to it to confirm that the parties intended for the term to have its plain and ordinary meaning. See Coast Fed. Bank, 323 F.3d at 1040 (looking to contemporaneous evidence of the parties' understanding and "not[ing] that much of it is consistent with the [contract's] plain meaning"). When a provision in a contract is susceptible to more than one reasonable interpretation, it is ambiguous, Edward R. Marden Corp. v. United States, 803 F.2d 701, 705 (Fed. Cir. 1986), and we may then resort to extrinsic evidence to resolve the ambiguity, see McAbee, 97 F.3d at 1435. We utilize extrinsic evidence to derive a construction that effectuates the parties' intent at the time they executed the contract. See Dureiko v. United States, 209 F.3d 1345, 1356 (Fed. Cir. 2000).

Even when a contract is unambiguous, it may be appropriate to turn to one common form of extrinsic evidence—evidence of trade practice and custom. Hunt Constr. Group, Inc. v. United States, 281 F.3d 1369, 1373 (Fed. Cir. 2002). We have stated that "evidence of trade practice may be useful in interpreting a contract term having an accepted industry meaning different from its ordinary meaning—even where the contract otherwise appears unambiguous—because the 'parties to a contract . . .

can be their own lexicographers and . . . trade practice may serve that lexicographic function in some cases.'" Id. (quoting Jowett, Inc. v. United States, 234 F.3d 1365, 1368 (Fed. Cir. 2000)).  Trade practice and custom may not be used, however, "to create an ambiguity where a contract was not reasonably susceptible of differing interpretations at the time of contracting."  Metric Constructors, 169 F.3d at 752.

The parol evidence rule provides a further limitation on the use of extrinsic evidence in interpreting contracts.  Under the parol evidence rule, extrinsic evidence pre-dating a written agreement may not be used "to add to or otherwise modify the terms of a written agreement in instances where the written agreement has been adopted by the parties as an expression of their final understanding."  Barron Bancshares, 366 F.3d at 1375 (citation and quotation marks omitted).  However, extrinsic evidence such as prior agreements and documents will be considered part of a contract when they are incorporated into the contract.  See S. Cal. Fed. Sav. & Loan Ass'n v. United States, 422 F.3d 1319, 1330 (Fed. Cir. 2005).  One common way to incorporate extrinsic evidence is through an integration clause that expressly incorporates the extrinsic evidence.  Id.; McAbee Constr. v. United States, 97 F.3d 1431, 1434 (Fed. Cir. 1996).  Although the parol evidence rule bars the use of extrinsic evidence to supplement or modify a written agreement, the rule does not bar the use of extrinsic evidence to interpret the terms of a contract when the plain and ordinary meaning is not clear from the contract itself.  See Restatement (Second) Contracts § 215 cmt. b (1981); 6-26 Corbin on Contracts § 579 (2006); Cibinic, Nash & Nagle, supra, at 199.  Armed with these rules, we turn to the issues TEG raises on appeal.

IV.

We consider first TEG's claim that the Court of Federal Claims erred in holding that it was required to clean debris and residue from pores and cracks of the Geneva Towers under the contract's abatement standard. As seen, the provision of the contract containing the abatement standard for the Geneva Towers project, Section 2080, 4.3C, provided:

> Asbestos-containing materials applied to concrete, masonry, wood and nonporous surfaces, including, but not limited to, steel structural members (decks, beams and columns), pipes and tanks, shall be cleaned to a degree that no traces of debris or residue are visible by the Observation Services Contractor.

The Court of Federal Claims correctly identified two issues raised by the abatement standard. First, we must determine whether this standard requires the removal of asbestos within pores and cracks. Second, we must determine what asbestos-containing "debris or residue" means.

Based upon the plain language of the abatement standard, we conclude that the Court of Federal Claims did not err in ruling that TEG was required to remove asbestos within pores and cracks. The plain language of the contract indicates that it requires abatement to the point that there is no "debris or residue . . . visible." Thus, to the extent that "debris or residue" was "visible" within the pores and cracks of concrete or other porous surfaces, it had to be abated under the contract. However, if the "debris or residue" was not "visible" within the pores and cracks, it was not required to be abated under the contract. Accordingly, we find that the plain and ordinary meaning of the abatement standard required TEG to remove visible asbestos within the pores and cracks of the towers.

As we did in Coast Federal Bank, we turn to extrinsic evidence, specifically, the course of dealing of the parties, to confirm that our interpretation of the plain and ordinary meaning was, in fact, the parties' understanding. See Coast Fed. Bank, 323 F.3d at 1040. The original specifications provided for two different abatement standards for friable and non-friable materials. As far as friable materials were concerned, the specifications expressly stated that materials must be cleaned "to a degree that no traces of debris or residue are visible." In contrast, the specifications provided that non-friable materials "shall be cleaned until no residue is visible other than that which is embedded in the pores, cracks, or other small voids below the surface of the material." Thus, the original specifications expressly allowed for the contractor to leave non-friable asbestos in pores and cracks. In a pre-bid conference call, TEG's representative stated that it was not clear which standard, friable or non-friable, would apply and that this was an important difference. TEG's representative noted, "It's a significant difference, because on one it has to be clean to a degree there's no trace; on the other, it's clean to a degree that material can still be embedded in pores, cracks and voids." In our view, the conference call demonstrates that TEG understood the visibility standard, which was eventually adopted for all asbestos abatement under the contract, to require that no asbestos remain in the pores and cracks.

We find unpersuasive TEG's argument that the Court of Federal Claims erred by failing to consider other pieces of evidence, including ATC's letter and Mr. Oberta's expert opinion. These documents could be considered evidence of trade practice and custom, which we have found appropriate to consider in some cases even when a contract is unambiguous. See Hunt Constr., 281 F.3d at 1373. However, neither of

these documents aids in the interpretation of a term of art in the asbestos abatement field. Rather each document offers an alternate explanation of the contract's abatement standard generally. Under Hunt Construction, it is not permissible to use these extrinsic sources to impart ambiguity into an otherwise unambiguous contract—they may only be used to interpret a term of art. Id. at 1369; see also Metric Constructors, 169 F.3d at 752. Given the clarity of the meaning from the language and the parties' pre-contractual negotiations, none of the extrinsic evidence cited by TEG carries weight.

We are also not swayed by TEG's argument that Section 2080, 4.3C requires only that "surfaces" be abated and that "surfaces" do not include pores and cracks. TEG turns to a common usage dictionary that defines a "surface" as "[t]he outer-face, outside, or exterior boundary of a thing; outermost or uppermost layer or area." Appellant's Br. at 21 (quoting Random House Webster's College Dictionary 1314 (2d ed. 1999)). We reject TEG's argument based on this definition that a "surface," as used in section 2080, 4.3C, is only the "outer-face" of the concrete and not the pores and cracks. The definition upon which TEG relies does not expressly state that "surfaces" do not include pores and cracks. Further, if we were to accept TEG's argument we would have to decide how small a crack or pore had to be in order to be excluded from "surfaces." The Court of Federal Claims correctly noted that we "would be left to quarreling over the depth of recess needed to differentiate a crack or pore from a smooth surface" if we adopted TEG's interpretation. TEG-Paradigm, slip op. at 13. We also find that TEG's "surfaces" argument is weak in comparison to the evidence of the parties' understanding of the language in the contract as demonstrated by the

conference call. Thus, we believe that the strict visibility abatement standard is more in line with the parties' contemporaneous understanding of Section 2080, 4.3C.

Turning to the second issue relevant to TEG's abatement standard claim, the meaning of "debris or residue," we see no error in the Court of Federal Claims's holding that, under the contract, any dust or powder found on inspection was assumed to be asbestos-containing "debris or residue" that had to be abated. "Debris" and "residue" are not defined in the contract. As previously noted, evidence of trade custom may be used to interpret terms of art such as "debris" and "residue." See Hunt Constr., 281 F.3d at 1373. The ASTM standard for asbestos abatement provides that debris and residue is "assumed" to contain asbestos. TEG-Paradigm, slip op. at 13. Therefore, we agree with the Court of Federal Claims that trade practice and custom demonstrates that in the asbestos abatement field any "debris and residue" found is assumed to contain asbestos. Id.. Thus, we affirm the Court of Federal Claims's holding that the contract required TEG to clean all visible powder and dust found on inspection, including powder and dust in cracks and pores.

V.

Turning to the work plan issue, we hold that the Court of Federal Claims correctly determined that the contract specifications, rather than TEG's work plan, governed the terms of contract performance. The government required a work plan conforming to the contract specifications before it accepted TEG's bid. Therefore, the work plan comprises a piece of extrinsic evidence pre-dating the formation of the contract. HUD required that bidders submit a work plan stating the details of the bidder's engineering controls and work procedures. Nowhere does the contract state that the work plan is to

be integrated into the contract and supersede the contract specifications. In contrast to the work plan, several sections of the FAR are incorporated by Section F of the specifications.[4] Additionally, Sections I, J, and K to the contract list not only numerous sections of the FAR that are incorporated by reference, but also several other documents relating to payment bonds, performance bonds, and wage rates. Further, we find unpersuasive TEG's argument that the work plan was incorporated into the contract merely by virtue of the fact that the plan was physically attached to the contract. Rumsfeld v. Freedom NY, Inc., 346 F.3d 1359, 1361 (Fed. Cir. 2003) (per curiam) ("One party to a contract cannot bind the other simply by attaching a document to a copy of the contract, even if that particular copy is signed. . . . Rather, the documents must clearly indicate that the parties intended that they be considered together as a single contract.") (internal citations omitted). Although the attachment of the two documents lends some support to TEG's argument, we conclude that it is not enough to incorporate the work plan given the facts of this case, which otherwise show that the work plan was not incorporated. Given that the contract expressly incorporates certain extrinsic documents, but does not incorporate the work plan, we find that the work plan is an extrinsic document that cannot be used to contradict or modify the contract under the parol evidence rule. See S. Cal. Fed. Sav. & Loan, 422 F.3d at 1330.

---

[4] For example, Section F incorporates FAR sections 52.252-2 ("Clauses Incorporated by Reference"), 52.242-15 ("Stop-Work Order"), 52.242-17 ("Government Delay of Work"), and 52.211-12 ("Liquidated Damages—Supplies, Services, or Research and Development"). See 48 C.F.R. §§ 52.252-2, 52.242-15, 52.242-17, 52.211-12.

We also find that there is no exception to the parol evidence rule for work plans in government contracts. The Court of Federal Claims correctly characterized TEG's work plan not as part of the contract, but rather as a pre-award submission used to aid the government in assessing TEG's ability to perform the contract. TEG-Paradigm, slip op. at 21. Under FAR 9.103, the government must award contracts to "responsible prospective contractors only." 48 C.F.R. § 9.103(a) (2006); see also Cibinic & Nash, Formation of Government Contracts, supra, at 404-06. Thus, the government requires pre-award submissions to assess whether the contractor will be able to perform the contract. Pre-award submissions, such as a work plan, are not part of the contract unless the contract specifically provides that they are to be incorporated. Examination of the contract at issue confirms that TEG's work plan was a pre-award submission that did not override the contract specifications. Section C of the contract specifications requires that the contractor submit a "work plan" containing information such as the names and contact information of the key personnel who would perform the contract, a detailed description of pollution control methods, and various safety and contingency plans. Again, nowhere in the contract is it stated that the contract incorporates the work plan. Thus, the government is correct that TEG's work plan was not part of the contract, but rather a piece of information that was used by the government to assess TEG's ability to perform in the pre-award stage.

Contrary to TEG's arguments, FAR sections 14.201-1 and 1552.22-74 do not compel us to find that work plans are incorporated into government contracts. FAR 14.201-1 sets forth the uniform contract format that must be used "to the maximum practicable extent" for certain types of contracts. 48 C.F.R. § 14.201-1 (2006). Section

14.201-1(c) states that acceptance of a bid "incorporates Section K, Representations, certifications, and other statements of bidders, in the resultant contract even though not physically attached."  Section K of the contract at issue incorporates several sections of the FAR that require particular submissions, e.g., taxpayer identification, FAR 52.204-3, whether or not the business is women-owned, FAR 52.204-5, and the type of business, FAR 52.214-2, see 48 C.F.R. §§ 52.204-3, 52.204-5, 52.214-2 (2006), respectively.  However, the work plan is contained in Section C of the contract and is therefore not a Section K representation, certification, or statement.  We find TEG's arguments under FAR 1552.211-74(c) equally unpersuasive.  FAR 1552.211-74(c) sets forth procedures for stopping work when a work plan is not approved.[5]  It does not state that work plans are incorporated into government contracts.

---

[5]      The contract provision contemplated by FAR 1552.211-74 states as follows:

> The Contractor shall acknowledge receipt of each work assignment by returning to the Contracting Officer a signed copy of the work assignment within __ calendar days after its receipt.  The Contractor shall begin work immediately upon receipt of a work assignment.  Within __ calendar days after receipt of a work assignment, the Contractor shall submit __ copies of a work plan to the Project Officer and __ copies to the Contracting Officer. The work plan shall include a detailed technical and staffing plan and a detailed cost estimate.  Within __ calendar days after recipt [sic] of the work plan, the Contracting Officer will provide written approval or disapproval of it to the Contractor.  If the Contractor has not received approval on a work plan within __ calendar days after its submission, the Contractor shall stop work on that work assignment.  Also, if the Contracting Officer disapproves a work plan, the Contractor shall stop work until the problem causing the disapproval is resolved.  In either case, the Contractor shall resume work only when the Contracting Officer finally approves the work plan.

Finally, our holding that work plans are not incorporated into government contracts is in accordance with the general principle that the government is entitled to strict compliance with contract specifications. See Granite Constr. Co. v. United States, 962 F.2d 998, 1006-07 (Fed. Cir. 1992) ("[T]he government generally has the right to insist on performance in strict compliance with the contract specifications and may require a contractor to correct nonconforming work."). This principle prevents contractors from submitting low bids and then substituting less-expensive materials for those required by the specification. Cibinic, Nash & Nagle, supra, at 815.

## CONCLUSION

For the foregoing reasons, we therefore affirm the decision of the Court of Federal Claims granting summary judgment in favor of the government on TEG's claims for breach of contract.

## COSTS

Each party shall bear its own costs.

## AFFIRMED

---

(Cont'd. . . .)

48 C.F.R. 1552.211-74.