# In the United States Court of Federal Claims

No. 12-228C
(Filed: January 10, 2013)

```
**********************************
                                 *
LARRYE CHEAVES,                  *
                                 *
              Plaintiff,         *
                                 *        Contract Disputes Act, 41 U.S.C. §§
     v.                          *        7101-09; Georgia Dig Law
                                 *
THE UNITED STATES,               *
                                 *
              Defendant.         *
                                 *
**********************************
```

## ORDER

Currently pending before the Court is the Government's Motion to Exclude Expert Report, filed November 2, 2012. Plaintiff, Larrye Cheaves ("Cheaves"), responded on November 16, 2012, and the Government filed its reply on November 26, 2012. For the reasons that follow, the motion is GRANTED.

### I.    Background

This case is brought under the Contract Disputes Act, 41 U.S.C. §§ 7101-09. Cheaves operates an underground utility location business, Subsurface Technologies ("ST"). Since 2004, ST has been locating Government-owned utilities for the Army at Fort Stewart ("Stewart") and Hunter Army Airfield ("Hunter"), both in Georgia. ST "locates" – by finding and marking – each utility at a given physical location, and once all utilities have been "located" at that physical location, a permit for excavation is issued.

In April of 2007, the parties entered into a contract for utility location services.[1] After providing background information, the contract contains a series of tabulated entries, each of which is assigned an "Item No." For example, Item No. 0001 states that the "base period" runs from "1 Apr 07 – 30 Sep 07." Item Nos. 0001AA and 0001AB provide data for Stewart and Hunter, respectively. These items are reproduced below, and are exemplary of the other entries in the contract.

---

[1] The first contract, which evidently operated from 2004 until the parties entered into the new contract in 2007, is not at issue in this matter, and is not before the Court.

| ITEM NO | SUPPLIES/SERVICES | MAX QUANTITY | UNIT | UNIT PRICE | MAX AMOUNT |
|---|---|---|---|---|---|
| 0001 | | UNDEFINED | | UNDEFINED | UNDEFINED |

Base Period: 1Apr 07 - 30 Sep 07
FFP
Locate Underground Utilities for Issuance of Dig Permits
FOB: Destination
PURCHASE REQUEST NUMBER: W33DL462008650

| | | | | MAX NET AMT | UNDEFINED |
|---|---|---|---|---|---|

| ITEM NO | SUPPLIES/SERVICES | MAX QUANTITY | UNIT | UNIT PRICE | MAX AMOUNT |
|---|---|---|---|---|---|
| 0001AA | | 672 | Each | $125.00 | $84,000.00 |

Locate Underground
FFP
Utitlities for Issuance of Dig Permits at Fort Stewart GA. Guaranteed Minimum
of 17 Locates/Permits per Month for Combined Loacations of Hunter Army
Airfield and Ft Stewart, GA.
FOB: Destination
PURCHASE REQUEST NUMBER: W33DL462008650

| | | | | MAX NET AMT | $84,000.00 |
|---|---|---|---|---|---|

| ITEM NO | SUPPLIES/SERVICES | MAX QUANTITY | UNIT | UNIT PRICE | MAX AMOUNT |
|---|---|---|---|---|---|
| 0001AB | | 203 | Each | $125.00 | $25,375.00 |

Locate Underground
FFP
Utitlities for Issuance of Dig Permits at Hunter Army Airfield, GA. Guaranteed
Minimum of 17 Locates/Permits per Month for Combined Loacations of Hunter
Army Airfield and Ft Stewart, GA.
FOB: Destination
PURCHASE REQUEST NUMBER: W33DL462008650

| | | | | MAX NET AMT | $25,375.00 |
|---|---|---|---|---|---|

Ex. A at 6-7.[2] Subsequent entries provide for four one-year option periods. Each of these one-year options provides a "Max Quantity" of 1,150 for Stewart and 350 for Hunter, but otherwise mirrors language reproduced above.

---

[2] "FFP" means "firm fixed price."

The primary question before the Court in this litigation is whether the "unit" referenced in these entries is directed at each utility located by ST or each permit processed after ST has located all the utilities at a given physical location. The definition of unit is important because at each physical location, there could be four or more separate utilities for which Cheaves must perform a "locate." Thus, Cheaves may have to perform at least four locates for each permit.

Cheaves takes the position that the contract is ambiguous, and he urges the Court to consider extrinsic evidence of trade usage of the terms "unit" and "locate" to resolve the alleged ambiguity. Based on this trade usage, Cheaves claims that the terms must be understood to mean that each "locate" (i.e., each separate utility he locates) is a contractual unit. The Government's position is that each permit is the proper unit. The relevance is readily apparent: the Government's position would result in a payment of $125 per permit, while Cheaves' would result in $500 or more per physical location. Multiplied over the 7,804 physical locations at which Cheaves performed services, these numbers quickly add up: Cheaves claims entitlement to an additional $2,976,500.00 on top of what he has already been paid.

The dispute surrounding the contract's terms crystallized at the Court's initial status conference in this matter, when Cheaves' counsel informed the Court that he intended to submit an expert report discussing the trade usage of the terms "unit" and "locate." The Government informed the Court that it would likely oppose the use of an expert in this matter. In order to streamline adjudication, the Court ordered Cheaves to file a notice of intent, wherein he was instructed to provide additional details on the purpose of filing his expert report and his position on ambiguity.

Based on the contents of the notice, the Government filed the instant motion seeking to exclude Cheaves' proposed expert report. The motion is fully briefed. The parties' briefing speaks to two broad questions: (1) whether the contract is ambiguous; and (2) whether it is appropriate for the Court to consider extrinsic, expert testimony on trade practice and custom.

## II.     Legal Standard

The starting point for any contract interpretation is the plain language of the agreement. *See Foley v. United States*, 11 F.3d 1032, 1034 (Fed. Cir. 1993) ("Contract interpretation begins with the plain language of the agreement."). A contract's language "must be considered as a whole and interpreted to effectuate its spirit and purpose, giving reasonable meaning to all parts." *Hunt Constr. Group, Inc. v. United States*, 281 F.3d 1369, 1372 (Fed. Cir. 2002). If the language of the contract is clear and unambiguous, the Court's review is generally limited to the contract itself. *See Teg-Paradigm Envt'l, Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006) (unambiguous language "must be given its 'plain and ordinary' meaning and the court may not look to extrinsic evidence to interpret its provisions.") ("*Teg*"). Ambiguity arises when a contract is susceptible to more than one reasonable interpretation. *Id.* (citing *Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed. Cir. 1986)).

Although review of an unambiguous contract is generally limited to the contract itself, there are exceptions to the rule. One such exception is where trade practice and custom may inform the meaning of an otherwise unambiguous term. *Teg*, 465 F.3d at 1338 ("Even when a

3

contract is unambiguous, it may be appropriate to turn to one common form of extrinsic evidence—evidence of trade practice and custom.") (citing *Hunt*, 281 F.3d at 1373). The Federal Circuit has held that "evidence of trade practice may be useful in interpreting a contract term having an accepted industry meaning different from its ordinary meaning—even where the contract otherwise appears unambiguous—because the 'parties to a contract … can be their own lexicographers and … trade practice may serve that lexicographic function in some cases.'" *Hunt*, 281 F.3d at 1373 (quoting *Jowett, Inc. v. United States*, 234 F.3d 1365, 1368 (Fed. Cir. 2000)). Properly applied, trade practice and custom may not be used "to create an ambiguity where a contract was not reasonably susceptible of different interpretations at the time of contracting." *Teg*, 46% F.3d at 1338 (quoting *Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.*, 169 F.3d 747, 752 (Fed. Cir. 1999)). Like other extrinsic evidence, trade practice may also be used to "confirm that the parties intended for the term to have its plain and ordinary meaning." *See Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1040 (Fed. Cir. 2003) (en banc). Trade practice may not be used to create ambiguity where there otherwise is none. *Metric Constructors*, 169 F.3d at 752.

### III.    Analysis

After a careful review of the parties' briefs and the exhibits submitted by Cheaves, the Court concludes that the contract is unambiguous. In light of *Teg*, however, the Court also considers the need for expert testimony on trade practice. The Court finds that this testimony would not further clarify the issues in this case, and it therefore grants the Government's motion to exclude.

#### a.  The Contract is Unambiguous

The Court begins with the plain language of the contract. The language at the center of this dispute is: "Locate Underground FFP Utilities for Issuance of Dig Permits." The Government focuses in on "for Issuance of Dig Permits," while Cheaves focuses in on "Locate Underground…Utilities." The contract sets a "Unit Price;" therefore, the dispute boils down to the question of whether the contemplated unit is a utility or a permit.

Taken on its own, without reference to any other portion of the contract, Cheaves' position is plausible – the tabulated Item entries state that Cheaves is to "Locate Underground… Utilities," and the entry below "Unit" simply states "Each."[3] *See, e.g.*, Ex. A at 6. In isolation, Cheaves' position makes sense.

Cheaves attempts to bolster his position by citation to other parts of the contract, but his argument is unpersuasive. He claims that "other contractual language indicates that the government hired Cheaves to locate utilities, and as a result, paid him based upon the location of those utilities…" Resp. at 13. As an example, Cheaves points to language in the qualifications section stating that the contractor (ST) must provide documentation of its personnel's "expertise at performing the location of underground utilities for excavation purposes." *Id.* (citing Ex. A at 3).

---

[3] The "Each" appears only in items *001AA and *001AB, not *001.

The simple fact that the contract refers to utilities, and in fact describes utility location as a requirement of the contract and duty of the contractor, does not mean that utilities are the contract unit. Locating utilities is a middle step in the process, and the permit is the end. This is, essentially, the tack the Government takes. For example, the Government points to the first paragraph of the contract, which states that "[t]he contractor shall provide personnel, management, equipment, material, transportation, and communication to *locate underground utilities and complete/approve excavation permits…*." Reply at 4 (citing Ex. A at 3) (emphasis added by Government). Likewise, the Government observes that paragraph 3.2 associates performance with completing and submitting permit requests. *Id.* (citing Ex. A at 5).

The Court agrees with the Government. Looking to the objective of the contract, it is clear that permits are the unit contemplated. Aside from the language cited above, the table that includes the unit listings states that the service provided by the contractor is to "Locate Underground … Utilities *for Issuance of Dig Permits…* Guaranteed Minimum of 17 Locates/Permits per Month." *Id.* at 6 (emphasis added). The end result in each instance is the issuance of a permit.

Cheaves also argues that performance of the contract would be impossible because he "had no authority or ability to issue a permit of any sort." Resp. at 15. He also notes that other locators had the responsibility of locating utilities not owned by the Government, such that he could not process permits because other utilities had to be located at each site. These facts, according to Cheaves, establishes two things: (1) Cheaves believed that he would be paid per "locate"; and (2) that he could not perform permit processing, rendering the Government's reading impossible.

This argument fails. As the Government observes, "[p]ayment under the contract is based upon[] processed excavation permits." Reply at 6. The contract specifically states that "[p]ermit requests, on site locates *and permit approvals* shall be based on Georgia UPC procedures[,] policies, laws/ by-laws as well as DPW [Directorate of Public Works] policies and procedures." Ex. A at 4 (emphasis added). Likewise, the contract states that the contractor will "Locate Underground … Utilities *for Issuance of Dig Permits*." It does not require the contractor itself to issue the permits. Thus, a per-permit payment structure does not render performance impossible.

The Court's conclusion that the contract contemplated payment on a per-permit basis is confirmed by another portion of the contract. Section 2.1 of the contract, entitled "Historical Data," indicates that "for FY 05 approximately 1,150 excavation permits were submitted at Fort Stewart and approximately 350 at Hunter Army Airfield." Ex. A at 4. The 1-year extension options listed on the contract provide "Max Quantity" values of 1,150 for each option at Fort Stewart and 350 at Hunter Airfield.[4] Thus, the maximum number of units defined in the contract corresponds *exactly* to historical *permit* data. This correspondence is not mere coincidence.

Although not necessary to its conclusion, the Court briefly addresses a final argument by the Government which was first raised in the parties' Joint Preliminary Status Report ("JPSR").

---

[4] The base period of the contract is not for a full year, such that the Court is not concerned that the estimates for the base period do not match the historical data.

5

In the JPSR, the Government stated that, "during the two option periods on the contract, plaintiff accepted payment from the Army based upon the number of permits processed. Plaintiff did not challenge the basis for payments until after the Government elected not to exercise the third option under the contract." JPSR at 3.

Cheaves has not addressed this issue, but the Government expanded on this position in response to Cheaves' claim that he understood payment to be based on each utility location. The Government correctly observes that pre-dispute conduct between the parties to a contract "is entitled to great weight in its interpretation." *Blinderman Constr. Co. v. United States*, 695 F.2d 552, 558 (Fed. Cir. 1982); *see also P.J. Dick Inc. v. Principi*, 324 F.3d 1364, 1375 (Fed. Cir. 2003). The Government claims that, not only did it pay Cheaves on a permit basis from April of 2007 until it declined to exercise the third option in that contract,[5] but it also paid Cheaves per-permit under the initial contract between the parties beginning in 2004. Cheaves' Complaint itself corroborates the fact that he did not dispute the Army's per-permit payments until after his company had performed locates at over 7,800 physical locations. Again, this observation is not necessary to the Court's finding, but it does bolster the Court's conclusion that the parties contemplated payment on the basis of permits rather than utilities.

Reading the contract as a whole, which it must, *Hunt*, 281 F.3d at 1372, the Court finds that there is only one reasonable interpretation of "unit" in this contract, and that interpretation is that "unit" refers to issued or processed permits. Thus, there is no ambiguity to be resolved by resort to extrinsic evidence.

### b. Evidence of Trade Practice is not Necessary

Even if the contract is unambiguous, *Teg* instructs the court that "it *may* be appropriate to turn to one common form of extrinsic evidence—evidence of trade practice and custom." *Teg*, 465 F.3d at 1338 (emphasis added). The Court now considers the question of whether it is appropriate to receive Cheaves' proffered expert report. For the reasons stated below, the Court finds that the proposed evidence of trade practice would serve no purpose here.

Cheaves has referred to two different terms – "unit" and "locate" – in support of his position on ambiguity and the need for expert testimony. His position is, effectively, that "unit" and "locate" are synonymous in the context of this particular contract, and that "locate" has a special meaning in trade. Cheaves claims that the special meaning attributed in trade to "locate" is sufficient justification for the Court to receive expert opinion on trade use, and refers the Court to the Common Ground Alliance *Best Practice* manual's definition of "locate," which mirrors the trade usage to which Cheaves' proposed expert would testify. *See* Ex. D at 73 (defining "locate" as "[t]o indicate the existence of a line or facility by establishing a mark through the use of stakes, paint or some other customary manner that approximately determines the location of a line or facility.").

The Government astutely responds that *Best Practices* is incorporated into the contract, *see* Ex. A at 3, such that its definition of "locate" is part of the contract. The Court agrees that it is, therefore, unnecessary to hear expert testimony that is merely redundant over a trade

---

[5] Per the contract, the second option period ended on September 30, 2009. Ex. A at 9.

definition that is already incorporated into the contract. The Court would, therefore, grant the Government's motion to exclude on this basis alone.

However, that is not the only basis upon which it is appropriate to grant the motion to exclude. Simply put, because the Court has found that the contract unambiguously contemplated payment on a permit basis, such that the trade usage of the term "locate" is irrelevant to the dispute before it. Thus, the proposed expert opinion would add nothing to this case. The Court grants the motion to exclude on this basis, as well.

## IV. Conclusion

Although this motion is submitted as a motion to exclude Cheaves' proposed expert report, it necessarily involves some effort at construing the contract. Through this effort, the Court has satisfied itself that the contract term "unit" refers to excavation or dig permits processed. In light of this finding, Cheaves' proposed expert offers nothing to move this case forward. Moreover, the contract already incorporates the trade usage to which the proposed expert would testify. For these reasons, the Government's motion to exclude is GRANTED, and the Court will not consider extrinsic evidence of trade usage in this matter. The parties shall adhere to the remaining briefing schedule established in this matter.

s/ Edward J. Damich
EDWARD J. DAMICH
Judge