[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-13945
Non-Argument Calendar
_____

D.C. Docket No. 7:12-cv-03691-RDP

GARY GLENN,
an individual,

                                          Plaintiff-Appellant,

versus

AMERICAN UNITED LIFE INSURANCE COMPANY,
a corporation,
DISABILITY REINSURANCE MANAGEMENT SERVICES INC,
a corporation,

                                          Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(April 14, 2015)

Before MARCUS, ROSENBAUM, and JULIE CARNES, Circuit Judges.

PER CURIAM:

Plaintiff Gary Glenn appeals from the district court's entry of judgment as a matter of law in favor of defendants American United Life Insurance Company and Disability Reinsurance Management Services, Inc. on his claim for wrongful denial of long-term disability benefits.  For the following reasons, we affirm.

## I.    BACKGROUND

Plaintiff previously served as Chief Executive Officer of Med Management, LLC.  At the time, Med Management participated in a trust to which American United Life Insurance Company ("American United") issued a Group Long-Term Disability Policy (the "Policy").  The Policy afforded Plaintiff disability insurance coverage.  Disability Reinsurance Management Services, Inc. (the "Administrator") served as administrator of all claims made under the Policy.

On May 9, 2008,[1] Plaintiff was forced to stop working because of anxiety and manic symptoms—later diagnosed as Bipolar Disorder—that impaired his decision-making and affected his mood and ability to focus.  Plaintiff received short-term disability benefits until August 2008, when he applied for long-term disability benefits under the Policy.  The Administrator approved Plaintiff's request on September 4, 2008, with retroactive application to August 7.

---

[1]  There is some discrepancy about the date Plaintiff ceased working.  We adopt the date alleged in Plaintiff's complaint.  But we note that Plaintiff's brief identifies the date as March 14, 2008, while defendants claim it was May 7, 2008.  Evidence in the record conflicts as to which date is correct, but in any event, the actual date Plaintiff stopped working has no real impact on his claim.

2

Though the Administrator noted that Plaintiff was then being treated "for a medical condition related to [his] lumbar spine," it approved Plaintiff's claim for long-term disability benefits based on his "medical diagnosis of anxiety and manic disorder." Importantly, with certain exceptions not applicable to Plaintiff, mental disability benefits are only available for twenty-four months pursuant to the Policy's Mental Illness Limitation clause.

Plaintiff collected the benefits for a time but was eager to return to work and did so on a graduated schedule beginning in early 2009. By February 24, 2009, Plaintiff had fully returned to work and ceased receiving benefits for the cognitive impairments he was suffering. But Plaintiff began to think he returned to work too soon, and in July 2009, he expressed concern to the Administrator about his ability to continue working. Specifically, Plaintiff informed the Administrator that he "had continued issues [with] his cognitive functioning associated [with] his bi-polar," that he felt "very negative to everything[] and ha[d] a big lack of motivation and positive reaction," and that, since his return, his partner had expressed concern in "high level meetings" about his performance. Further, Plaintiff's psychiatrist, Dr. Joe Lucas, recommended that Plaintiff stop working.

Reluctantly, Plaintiff again ceased working on August 20, 2009. He resumed receiving benefits under the Policy's Recurrent Disability clause, which

3

permitted him to receive payments under his prior qualifying mental health disability. This allowed Plaintiff to collect benefits without having to endure a second "Elimination Period," but it also restarted the two-year benefit period clock at the point where Plaintiff resumed working after his first stint on disability.

On May 7, 2010, while Plaintiff was still collecting benefits, the Administrator sent Plaintiff a letter informing him that his twenty-four month "mental and nervous limitation" period would expire on January 31, 2011. The Administrator knew that Plaintiff also suffered from back pain, so its letter invited him to provide medical documentation to support a disability claim for a physical limitation.

Plaintiff and the Administrator spoke on a phone call on October 29, 2010, during which Plaintiff informed the Administrator that "his back [pain] is an issue but the bigger issue is bi-polar and not being able to focus, or think positively." When prodded as to how his back pain would preclude him from working, Plaintiff stated that it was "[n]ot from doing the job so much as mental aspects[,] but in terms of being problematic in meetings, [the pain] definitely contributes to not being able to do [the] job effectively." Plaintiff expressed particular concern about being "self[-]conscious to have to excuse [him]self to get [his] back stretched," and

4

also about his ability to "try to stretch and bend" in a board meeting, as he must for comfort.

On November 24, 2010, the Administrator sent Plaintiff a second letter reminding him of the approaching termination date of his mental health benefits and requesting a supplemental Attending Physician's Statement. Plaintiff's primary care physician, Dr. W. Guy Patterson, completed the form, indicating that Plaintiff suffered from, among other things, problems with his left and right sciatica, degenerative disc disease, and depression. When the Administrator inquired as to whether Dr. Patterson thought that Plaintiff's physical limitations precluded him from work, Dr. Patterson responded that he did not perform disability exams, but he prescribed that Plaintiff undergo a Functional Capacity Exam. Plaintiff participated in the exam, which concluded that he was able to perform light, sedentary work.

On a subsequent call with the Administrator, Plaintiff stated that his pain had shifted over the preceding six months from his lower back to shooting from his left hip to ankle. Plaintiff claimed that this new pain was more severe than that previously suffered and that he required a Lortab prescription to manage the pain. Further, at Dr. Patterson's behest, Plaintiff had seen a neurosurgeon, Dr. Colby Maher, who speculated that he may be suffering from Piriformis Syndrome.

5

Sometime later, the Administrator sought opinions from Drs. Patterson and Maher regarding Plaintiff's Functional Capacity Exam results. Both agreed with the conclusion that Plaintiff could perform sedentary work at a light demand level. Accordingly, on May 4, 2011, the Administrator informed Plaintiff he was no longer entitled to long-term disability benefits.[2] Relying on the Functional Capacity Exam, Dr. Patterson and Dr. Maher's opinions that Plaintiff could "perform activities of a light nature," and its own medical consultant's conclusion that Plaintiff was capable of performing sustained light physical activities, the Administrator determined that Plaintiff was "not physically disabled from performing [his] regular occupation as [CEO of Med Management]."

Plaintiff responded by lodging an appeal with the Administrator. In support, he filed several additional documents, including a favorable disability decision from the Social Security Administration,[3] updated medical records and a sworn

---

[2] Plaintiff's mental health benefits expired on January 31, 2011, but the Claims Administrator agreed to continue paying benefits until it could determine whether Plaintiff suffered from a disabling physical condition.

[3] We note here that our decision to affirm the denial of long-term benefits and the Social Security Administration's grant of disability benefits are not necessarily at odds. "[T]he approval of disability benefits by the Social Security Administration is not considered dispositive on the issue of whether a claimant satisfies the requirement for disability under an ERISA-covered plan." *Whatley v. CNA Ins. Cos.*, 189 F.3d 1310, 1314 n.8 (11th Cir. 1999). Additionally, Plaintiff's attorney refused to furnish the Administrator the materials relied upon by the Social Security Administration, distinguishing this case from *Melech v. Life Insurance Company of North America*, 739 F.3d 663, 672–76 (11th Cir. 2014). There is no allegation that

6

statement from Dr. Patterson, the results of an Independent Medical Examination performed by orthopedic surgeon Dr. Kenneth Jaffe, responses to questions regarding Plaintiff's Functional Capacity Exam provided by David Bledsoe, and a report from vocational rehabilitation counselor John Long.

Upon receipt of the additional documents, the Administrator retained medical consultant Dr. Sharon Hogan to review Plaintiff's file. Dr. Hogan determined that a preliminary question impeded her examination. Specifically, she needed to know "whether [Plaintiff's] reported cognitive dysfunction is organic or psychological/psychiatric in etiology." In other words, she questioned whether Plaintiff's cognitive impairments were the result of his back pain or his Bipolar Disorder. Plaintiff would qualify to receive long-term benefits if his cognitive disability stemmed from his back pain, but not if it stemmed from his Bipolar Disorder or depression. Dr. Hogan outlined a three-part investigation to aid in this determination: (1) request a neuropsychological evaluation with personality testing, (2) retrieve Plaintiff's 2011 pharmacy profile, and (3) inquire with Plaintiff's employer whether he had "any performance issues" between January 2007 and March 2008.

---

the Policy *required* Plaintiff to apply for Social Security benefits, as did the policy at issue in *Melech*. 739 F.3d at 674.

Dr. Hogan's effort was stymied at step one when Plaintiff, with recently-acquired legal representation, refused to submit to a neuropsychological examination. Plaintiff reasoned that the Policy's Physical Examination clause permits the Administrator to require only *physical* examinations—it does not encompass mental testing. Consequently, the Administrator could not determine the cause of Plaintiff's mental impairments and affirmed its denial of benefits in a letter on March 9, 2012. In support, the Administrator cited Plaintiff's ability to work in spite of "pain complaints [over] a number of years," a psychiatric condition that precipitated his earlier receipt of disability benefits for mental impairments, and a "lack of medical evidence to support a physical condition that would prevent [him] from working."

Plaintiff filed suit contesting the Administrator's findings on October 24, 2012, pursuant to the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"). The parties filed cross motions for judgment as a matter of law. Finding that Plaintiff failed to establish an entitlement to long-term disability benefits under the Policy, the district court entered judgment as a matter of law in favor of defendants. This timely appeal followed.

## II. STANDARD OF REVIEW

8

We review de novo a district court's decision affirming an ERISA plan administrator's determination regarding benefit eligibility, applying the same standards as the district court. *Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1354 (11th Cir. 2011). Our review considers only "the material available to the administrator at the time it made its decision." *Id.*

Because ERISA does not set out a standard of review, this Court has developed a multipart test, relying on *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989), and *Metro. Life Ins. Co v. Glenn*, 554 U.S. 105, 111 (2008), as guides. We proceed in the following manner:

(1)   Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2)   If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3)   If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4)   If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

9

(5)     If there is no conflict, then end the inquiry and affirm the decision.

(6)     If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship*, 644 F.3d at 1355.

## III.    ANALYSIS

Our analysis in this case begins and ends at the first step of the test.  We conclude that the Administrator's determination that Plaintiff is not entitled to long-term disability benefits is not "wrong."[4]  "A decision is 'wrong' if, after a review of the decision of the administrator from a *de novo* perspective, 'the court disagrees.'"  *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1246 (11th Cir. 2008) (quoting *Williams v. BellSouth Telecomms., Inc.*, 373 F.3d 1132, 1138 & n.8 (11th Cir. 2004)).  We consider, "based on the record before the administrator at the time [the] decision was made, whether [we] would reach the same decision as the administrator.  If [we] determine[] that the plan administrator was right, the analysis ends and the decision is affirmed."  *Id.* at 1246–47.  When appealing the Administrator's denial of long-term disability benefits, Plaintiff bears the burden to prove that he is disabled.  *Doyle v. Liberty Life Assur. Co. of*

---

[4]  The parties agree that the Administrator did not possess discretion when reviewing claims and that the correct standard of review is de novo.

10

*Boston*, 542 F.3d 1352, 1362 (11th Cir. 2008); *Glazer*, 524 F.3d at 1247; *see also* 29 U.S.C. § 1132(a)(1)(B) (2014).  Plaintiff has not carried that burden.

Under the Policy, Plaintiff must show that "because of [i]njury or [s]ickness[,] [he] cannot perform the material and substantial duties of his regular occupation."  The policy defines "injury" as "bodily injury resulting directly from an accident and independently of all other causes."  It defines sickness as an "illness, bodily disorder, disease, Mental Illness, or pregnancy."  Here, Plaintiff had already exhausted his two years of mental health benefits, so in order to obtain long-term disability benefits, he had to show that a disabling physical condition precludes him from performing his duties at Med Management.

To that end, Plaintiff claims (1) that his back pain makes it impossible to maintain a work posture for an eight-hour day and (2) that his necessary pain medications cloud his mind to the point that he cannot perform his tasks as CEO. We consider each of these claims, beginning with the effects of the medication, and we conclude that the Administrator was not "wrong" to deny Plaintiff's claim for long-term benefits.

## A.    The Impairing Side Effects of Plaintiff's Medications

Plaintiff began suffering from back pain as early as July 2006, when an MRI revealed an impinged nerve in his lower back.  In July 2007, a neurosurgeon

11

diagnosed Plaintiff with foraminal stenosis,[5] for which he received epidural steroid injections in February 2008.  Nevertheless, Plaintiff's back pain did not preclude him from working at that point, nor did his short-term memory problems, which he experienced as a side effect of the medication he was then taking.

Not long after, in March 2008, Plaintiff was admitted to the hospital for chest pain.  While there, Plaintiff reported "mental [] and personality symptoms" that began when he received epidural steroid injections the month prior.  The mental and personality changes caused problems at work, where Plaintiff struggled in meetings, and at home, where he was "obsessive and agitated."  Plaintiff admitted to staff that he was stressed, and the discharging physician concurred, writing that Plaintiff's "problems are related to stress as he has trouble with his son, his mother, and his job."  A consultative neurological examination concluded that Plaintiff suffered from "cognitive impairment and personality change." Consequently, the discharging physician recommended that Plaintiff resume taking Lexapro, a prescription medication used to treat depression and anxiety, which he had recently stopped taking.

---

[5]  Stenosis is "a narrowing of spaces in the spine [] that results in pressure on the spinal cord and/or nerve roots" and "may give rise to pain or numbness in the legs."  *What is Spinal Stenosis?*, Nat'l Inst. of Arthritis & Musculoskeletal & Skin Diseases (Jan. 2013), *available at* http://www.niams.nih.gov/Health_Info/Spinal_Stenosis/ (last accessed Jan. 22, 2015, 5:27 p.m.).

Subsequently, Dr. Lucas diagnosed Plaintiff with Bipolar Disorder and depression, to which he was predisposed.  Thereafter, Plaintiff received the full two-year limit of long-term disability benefits *solely* for the "medical diagnosis of anxiety and manic disorder," which affected his ability to perform the critical thinking that his position required.

Now, Plaintiff claims that the same cognitive impairments for which he previously received mental illness disability benefits—and that he and his physicians consistently attributed to his Bipolar Disorder—are in fact side effects of the medications that he takes for his back pain.  Simply put, there are conflicts in the record as to the source of Plaintiff's cognitive impairments that prevent him from performing his job.  Reviewing that record, we conclude that Plaintiff has failed to show that these impairments stem from a physical condition, which is a showing that is necessary to entitle Plaintiff to long-term disability benefits.

First, Plaintiff's contention that his disabling cognitive impairments are the result of his pain medications finds no support in Dr. Lucas's psychiatric treatment notes, which persistently diagnose Plaintiff with Bipolar Disorder and depression and identify those mental illnesses as the source of his disability.  To the extent that Dr. Lucas believed the epidural steroid injections for back pain precipitated Plaintiff's Bipolar Disorder, Plaintiff admits that other physicians disagreed.

13

Nor does internist Dr. Patterson's recent sworn statement convince us that Plaintiff's pain medications impact his focus, concentration, and processing abilities to the point that he is unable to function as CEO because Dr. Patterson previously found that those disabling conditions stemmed from Plaintiff's Bipolar Disorder and depression. *See Blankenship*, 644 F.3d at 1356 ("Plan administrators need not accord extra respect to the opinions of a claimant's treating physicians.").

Of course, orthopedic surgeon Dr. Jaffe did find that the side effects of Plaintiff's pain medications, of which he required a "significant amount," caused him problems "relat[ing] to cognition." However, several factors weigh against Dr. Jaffe's opinion. First, according to Dr. Patterson, Plaintiff "does not take pain medications regularly," and no information in the record explains how the sporadic use of medications could cause Plaintiff's constant cognitive impairments. Second, Plaintiff has repeatedly complained of mental impairments at work over a number of years despite his physicians' frequent tinkering with his prescriptions. During this time, his symptoms persisted even though his medications were changed. Additionally, Plaintiff at times informed the Administrator that his pain medications *were helping* his condition. And finally, while Plaintiff occasionally complained about these medications, in March 2010 he identified the cause of his

14

disability as Bipolar Disorder, to which he attributed his "anxiety; depression; [inability] to focus; [lack of] motivation[; and] memory loss."

In sum, there are inconsistencies in the record about the source of Plaintiff's cognitive disability. Up to the point that Plaintiff exhausted his mental health benefits, his physicians consistently ascribed his cognitive disability to his Bipolar Disorder and depression. Their diagnoses later changed. *See Blankenship*, 644 F.3d at 1356. Accordingly, Plaintiff has not carried his burden of proving that his cognitive impairments are side effects of his pain medications, rather than the effects of his Bipolar Disorder and depression.

## B.    Disabling Physical Pain

In addition to the cognition-related side effects of his pain medications, Plaintiff alleges that he suffers from disabling physical pain that entitles him to long-term disability benefits under the Policy. Plaintiff's strongest piece of evidence indicating a disabling physical impairment is the Independent Medical Exam performed in September 2011 by Dr. Jaffe. Dr. Jaffe found that Plaintiff was "unable to sit or stand for any extended lengths of time because of the severe pain in his lower back." He explained that sitting for more than thirty minutes caused Plaintiff significant pain, and, in his opinion, Plaintiff could only sit or

stand for less than one hour at a time and less than a total of three hours in a single work day.

On the other hand, the Functional Capacity Exam that Plaintiff underwent in February 2011—on which he "performed well" and which he undertook without the assistance of his medications—found that Plaintiff "demonstrated the ability to function at the full range of LIGHT work." Upon review, Drs. Patterson and Maher agreed with this conclusion.[6]

Later, in a sworn statement taken by Plaintiff's attorney, Dr. Patterson qualified his earlier agreement with the result of the Functional Capacity Exam. Namely, while he did not disclaim his prior opinion that Plaintiff could physically perform light work, he did note that he did not consider at the time "the question of [whether Plaintiff was] able to function at a cognitive level as well." With that

---

[6] On appeal, Plaintiff argues that the Administrator abused its discretion by considering the results of Plaintiff's 2011 Functional Capacity Exam because it lacked the authority to require Plaintiff to undergo an examination conducted by an occupational therapist. For three reasons, we reject this claim. First, Plaintiff *consented* to the Functional Capacity Exam, for which his primary care physician provided a prescription. Second, and notably, the Administrator only resorted to the Functional Capacity Exam because its request for Dr. Patterson's opinion about the extent of Plaintiff's disability returned the response that Dr. Patterson "do[es] not perform disability exams." *Cf. Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1199–1200 (11th Cir. 2010) (an insurer's denial of disability benefits was clearly "wrong" where the insurer failed "to fully investigate [the plaintiff]'s claims" to determine the cause and circumstances surrounding his injury). Finally, Plaintiff's notion that the Administrator "undoubtedly would have used [any] refusal to be examined as grounds to terminate his benefits" is conjecture.

16

consideration in mind, Dr. Patterson now contends that Plaintiff's "pain level is significant enough that he would not be able to function at work."

This opinion contrasts starkly with neurosurgeon Dr. Maher's March 2011 treatment notes, where he found that Plaintiff's leg pain "ha[d] completely resolved and [that] he is very happy." As for Plaintiff's back, Dr. Maher noted that "he is better" and that "[i]t is still a bit of a mystery what caused his symptoms." Indeed, Dr. Maher wrote that Plaintiff had only "very mild low back pain" at the time.

Nor does Dr. Patterson's sworn statement jibe with his earlier view of Plaintiff's physical impairment. Dr. Patterson's initial Attending Physician's Statement identified Plaintiff as physically capable of performing sedentary work for an eight-hour day. Although he indicated in September 2008 that Plaintiff felt back pain when standing for more than one hour or sitting for more than thirty minutes, Dr. Patterson did not indicate that such pain would preclude Plaintiff from performing his job, in contrast to his view of Plaintiff's cognitive impairments, which were attributed to his Bipolar Disorder. And one year later, Dr. Patterson indicated that Plaintiff had only a Class II physical impairment, meaning that he was limited to "[m]edium manual activity," maintaining that Plaintiff's "reason for disability relates to [his] depression with bipolar features."

17

The most severe diagnosis of Plaintiff's physical disability came in December 2010, when Dr. Patterson determined that Plaintiff suffered a Class IV physical impairment, meaning that he had a "[m]oderate limitation of functional capacity" but was still "capable of clerical/administrative (sedentary) activity." Notably, Dr. Patterson did *not* indicate that Plaintiff had a Class V physical impairment, meaning that he would be precluded from even sedentary activity.

Finally, there are Plaintiff's own conflicting statements, which present several different narratives. Plaintiff earlier informed the Administrator that his back condition was "[a]lways there," and that he had "realized that it will always be there." Rather than creating complications at work, Plaintiff described his "[forty-five] minute drive" as the most difficult aspect of his back pain. Then, in September 2009, Plaintiff told the Administrator that he would be able to return to work if he did not have his back condition. However, the next year he told the Administrator that "his back is an issue[,] but the bigger issue is bi-polar and not being able to focus, or think positively, [and his] negative thoughts." And in February 2011, Plaintiff told the Administrator that his pain "changed totally" from occurring in his lower back to "start[ing] in his hip and ma[king] its way down to [his] left leg to about his ankle," which statement Dr. Patterson's treatment notes confirm. The very next month, though, Dr. Maher wrote that Plaintiff's leg pain

18

had "completely resolved."  Finally, Plaintiff admits that he possesses the physical capacity to perform household chores, complete yard work, and go fishing, albeit with some difficulty.

Accordingly, because there is ample evidence that Plaintiff's physical pain does not prevent him from performing "the material and substantial duties of his regular occupation," and because the policy requires Plaintiff to show that physical pain is the cause of his disability, Plaintiff has not met his burden.  *See Glazer*, 524 F.3d at 1247 (finding that the district court was not "wrong" to deny claimant disability benefits where "[t]he record contains ample evidence that Glazer is not disabled within the meaning of the policy").  Plaintiff is thus not entitled to long-term disability benefits.

### C.    Conclusion

Plaintiff has not carried his burden to prove that he suffers from a disabling physical impairment for which he is entitled to receive long-term disability benefits.  *See Doyle*, 542 F.3d at 1362; *Glazer*, 524 F.3d at 1247.  First, he has not provided evidence sufficient to indicate that his cognitive impairments result from side effects of his pain medications, as the record shows that his physicians previously believed that the impairments stem from his Bipolar Disorder and depression.  Nor has he shown that he suffers disabling pain that precludes him

19

from "perform[ing] the material and substantial duties of his regular occupation" because the record contains ample evidence that he could adequately perform his duties. *See Glazer*, 524 F.3d at 1247. Drs. Patterson and Maher agreed that Plaintiff could perform light, sedentary work, with the latter subsequently finding that Plaintiff's pain had completely resolved. Accordingly, Plaintiff has not shown an entitlement to long-term disability benefits, and the Administrator's decision denying his claim for such was not "wrong."

Because we arrive at this conclusion, we do not reach Plaintiff's argument on appeal that the Administrator did not possess the authority to compel him to undergo a neuropsychological examination. Because we analyze the Administrator's determination de novo, we also do not reach Plaintiff's argument that the district court erred in considering Plaintiff's refusal to undergo a neuropsychological examination.

**AFFIRMED.**

20