# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| Automotive Management Services FZE | )     ASBCA No. 58352 |
| | ) |
| Under Contract No. W52P1J-11-C-0014 | ) |

APPEARANCE FOR THE APPELLANT:      James W. Kim, Esq.
                                                McDermott Will & Emery
                                                Washington, DC

APPEARANCES FOR THE GOVERNMENT:      Raymond M. Saunders, Esq.
                                                  Army Chief Trial Attorney
                                                CPT Harry M. Parent III, JA
                                                  Trial Attorney

## OPINION BY ADMINISTRATIVE JUDGE MELNICK ON THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

This is a case about payment. Automotive Management Services FZE (AMS) entered into a contract with the government to provide vehicle and maintenance support to the Afghanistan National Security Force. It seeks payment for the cost of transporting vehicle parts within Afghanistan, which were costs the government previously approved for the first ten months of performance. The government contends that transportation of the parts within the country was a cost falling under the firm-fixed-price provisions of the contract and not separately reimbursable. It says its prior payment of those costs was a mistake. The parties have submitted their second set of cross-motions for summary judgment. Appellant's motion is granted and the government's motion is denied.

## STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTIONS

The following facts are not in dispute:

1. On 30 December 2010, the United States Army's Rock Island Contracting Center awarded Contract No. W52P1J-11-C-0014 to AMS. The contract stated that AMS was to support the Afghanistan National Security Force (ANSF) in accordance with a Performance Work Statement (PWS) dated 10 September 2010. (R4, tab 1 at 1-2) The contract was firm-fixed price except for two line items (*id.* at 2). Significantly, contract line item number (CLIN) 0005AA, Spare Parts, was cost reimbursable (*id.* at 11).

2. The PWS explained in detail that the contract provided for vehicle and equipment support to the ANSF Ministry of Defense (MOD) and Ministry of Interior (MOI). The MOD fleet included the Afghanistan National Army (ANA) and was supported at 9 locations. The MOI fleet included the Afghanistan National Police (ANP) and was supported at 21 maintenance locations, as well as one Central Maintenance and Supply facility. (R4, tab 2 at 3)

3. The PWS included separate requirements for MOD/ANA and MOI/ANP fleet maintenance (R4, tab 2 at 10, 18). Relevant here are the MOI/ANP requirements.[1] In pertinent part they provided:

> **3.23 OBJECTIVE-THREE (3). MOI/ANP FLEET MAINTENANCE.** The contractor shall be responsible for providing all the management, expertise, personnel, equipment, tools, vehicles, fuel (life support/contractor transportation), security, and life support to perform the requirement. The contractor shall provide equipment maintenance and supply chain management for the MOI/ANP fleet....
>
> 3.23.1 **Tasks associated include the following:**
>
> ....
>
> 3.23.1.8 Manage a repair parts warehouse to include distribution of repair parts.
>
> ....
>
> **3.43 SUPPLY CHAIN MANAGEMENT.** Contractor shall provide a commercially available supply chain management system that interfaces with the supported maintenance management system and allows for monthly reconciliation. These systems must be fully transferable to the Afghanistan Government without proprietary restrictions or financial obligations. The contractor shall manage a supply warehouse [and] operate class IX parts procurement and requisitioning program. The supply chain management program shall include a viable distribution program for repair

---

[1] AMS contended at oral argument that it was not awarded the MOD/ANA portion of the contract (tr. 1/53). It is not necessary to resolve that question here.

2

parts to each maintenance site.... All costs of providing the warehouse facility as well as the management and personnel portion of this requirement shall be a firm-fixed price effort. The contractor shall invoice the government for the costs of parts on a monthly basis, as outlined in the PWS.

....

**3.45 PARTS PROCUREMENT.** The contractor shall not add any costs, additional fees, mark ups, company derived inflation costs, or any other factor that changes the item's actual retail cost. For price comparison purposes, and if there is a dispute between the USG and contractor, the ACO shall determine if a source is appropriate. The requirement for premium freight costs for mission essential equipment must be validated in advance by the COR. The contractor shall seek fair and reasonable prices.... *The contractor shall consider freight and/or delivery fees when evaluating prices.* When requesting quotes, the contractor should select suppliers who provide quality products at fair and reasonable prices and consistently deliver items on time.

(R4, tab 2 at 18, 23-24) (Italics added)

4. On or about 20 April 2011, the parties executed Modification (Mod.) No. P00002 to incorporate a revised PWS dated 11 March 2011 (R4, tab 4 at 2, tab 5). The relevant parts of the revised PWS were virtually identical to the original (tr. 1/13-14) except the revised version did not contain the language of section 3.23.1.8, which had required AMS to provide management of a warehouse and distribution of parts.[2]

5. For roughly ten months after contract award, AMS submitted invoices for the cost of shipping repair parts within the country, which were approved by the government (Schuin decl. ¶ 5; R4, tabs 7, 10, 18 at 2-3; app. mot. at 5, ¶ 6).

6. Mod. No. P00007, dated 18 August 2011, added a 28 July 2011 Guide for Government Approval & Oversight of Contractor Purchasing & Invoicing (Purchasing Guide) (R4, tab 6; Jt. Stips. ¶ 19). The government did not explain the need for the Purchasing Guide (Schuin decl. ¶ 3). This draft guide described the specific acts to be

---

[2] This decision cites the provisions of the original PWS.

3

performed to process payment requests by AMS. A revised version of the Purchasing Guide, dated 28 September 2011, was incorporated into the contract through Mod. No. P00008 on 24 October 2011 (R4, tab 8; Jt. Stips. ¶ 19). With respect to the procurement of parts, the revised Purchasing Guide stated as follows:

> (v) Per the PWS, only the cost of parts or costs directly related to the repair and maintenance of the equipment that is in addition to work already included in the contractor's firm fixed price cost, shall be purchased against the spare parts CLIN in the contract. An example of this type of cost would be sending a part out for rebuild to a local shop due to this type of capability not being required at the EMS shop and rebuild of part is more beneficial to the Government than purchasing a new part. *Delivery and shipping costs are considered a cost associated to the part purchase.* No overhead or profit can be added to the parts purchase. All other costs associated to parts procurement must be included in the cost of the contractor's firm fixed price for supply chain management.

(R4, tab 8 at 19) (Italics added)

7. By email dated 30 November 2011, AMS submitted to the government completed forms for approval of transportation costs that it designated T007, T008, and T009. All of the forms were dated 29 November 2011 and referred to transportation services obtained around that date. (R4, tabs 9-10) On 10 December 2011, the ACO disapproved those costs, stating:

> The USG is reimbursing the freight charges for the parts that are coming into the [sic] Afghanistan. However, once the parts are in Afghanistan, the distribution of the parts in the country is under the supply chain management (FFP). According to the PWS 3.5.3 "the supply chain management program shall include a viable distribution program for repair parts to each maintenance site...."
>
> My understanding is that the USG has approved the transportation fees in the past. However, that will be adjusted accordingly with the future invoices.

(R4, tab 10)

4

8. By email dated 13 December 2011, AMS objected to the government's position, contending that "all costs for transportation were covered in the cost reimbursable CLIN for spare parts (0005)" (R4, tab 11). On 5 March 2012, the Defense Contract Audit Agency issued a "NOTICE OF CONTRACT COSTS SUSPENDED AND/OR DISAPPROVED," disapproving a total of $572,100.56 that was previously billed to the government from April 2011 through October 2011 for transportation, crane rental, and container movement costs. The Notice claimed these costs were a component of supply chain management under the PWS, which was firm-fixed price and not cost reimbursable. (R4, tab 15 at 15-16)

9. On 11 April 2012, AMS submitted a certified claim seeking reimbursement of the disallowed invoices in the amount of $572,100, and reserving the right to amend the amount sought given that contract performance was continuing (R4, tab 15 at 2). On 12 July 2012, the CO issued a final decision denying AMS' claim (R4, tab 18 at 2). The contracting officer acknowledged that transportation costs had previously been approved, but explained:

> Since the beginning of the contract in-country transportation costs related to spare parts were not disapproved because select samplings taken by the Government never caught the fact that in-country transportation costs were being billed to the Government until recently. The in-country transportation costs would have been caught during the final audit and the Government would have been able to take corrective action for the costs associated at that time.

(*Id.*)

10. This timely appeal followed.

## PRIOR PROCEEDING

The Board previously denied cross-motions for summary judgment by the parties, concluding it required additional evidence. *Auto. Mgmt. Servs.*, ASBCA No. 58352, 14-1 BCA ¶ 35,646. After that decision, the parties communicated that they continued to believe that no material facts were in dispute and that they intended to file a second set of cross-motions for summary judgment addressing the Board's prior concerns. These motions followed.

5

<u>DECISION</u>

Summary judgment should be granted if it has been shown that there are no genuine issues of fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A non-movant seeking to defeat summary judgment by suggesting conflicting facts "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968)).

Both parties contend again that there are no material facts in dispute and that each is entitled to summary judgment as a matter of law. AMS argues that section 3.45 of the PWS, which stated that "[t]he contractor shall consider freight and/or delivery fees when evaluating prices," in conjunction with the Purchasing Guide, entitled it to payment of transportation related charges by making shipment of parts within the country subject to CLIN 0005's cost-reimbursement provision. It suggests its interpretation is bolstered by the fact that the government paid charges for transportation within Afghanistan for the first ten months of contract performance. It also says that any ambiguity should be construed in its favor. The government maintains that section 3.45 only applied to the transportation of parts and shipment to AMS' warehouse in Afghanistan, not their distribution within the country to maintenance sites. Instead, shipping costs within Afghanistan were incorporated within section 3.43's firm-fixed-price management requirement. It also suggests that its prior approval of transportation costs is irrelevant and would have been corrected after a final audit and corrected.

Determining the meaning of a contract starts with its language. *TEG-Paradigm Environmental Inc. v. United States,* 465 F.3d 1329, 1338 (Fed. Cir. 2006). "When the contract's language is unambiguous it must be given its 'plain and ordinary' meaning and the court may not look to extrinsic evidence to interpret its provisions." *Id.* at 1338. "Construction of the language of the contract to determine whether there is an ambiguity is [also] a question of law." *Gardiner, Kamya & Assocs., P.C. v. Jackson,* 467 F.3d 1348, 1353 (Fed. Cir. 2006). Extrinsic evidence cannot be used to create an ambiguity where none otherwise exists. *McAbee Constr., Inc. v. United States,* 97 F.3d 1431, 1435 (Fed. Cir. 1996). Contract terms are ambiguous when read as a whole if they are susceptible to more than one reasonable interpretation. *Id.* at 1434-35. Accordingly, the task here is to decide whether this contract unambiguously permitted AMS to recover payment for the cost of transporting parts within the country, whether it unambiguously included that cost as part of AMS' fixed-price services, or whether it is subject to more than one reasonable interpretation.

Consistent with CLIN 0005AA, which made spare part costs reimbursable (SOF ¶ 1), section 3.43 of the PWS instructed AMS to "invoice the government for the

6

costs of parts on a monthly basis, as outlined in the PWS" (SOF ¶ 3). Section 3.45 then directly addressed parts procurement. Though it generally barred AMS from adding fees and mark ups to the prices it passed on to the government, it required AMS to "consider freight and/or delivery fees when evaluating prices," indicating, without limitation to destination, that shipping costs would be reimbursable. (*Id.*) Similarly, the Purchasing Guide, added in its final form in late October 2011, specified that "[d]elivery and shipping costs" were to be "considered a cost associated to the part purchase," again with no restrictions upon the shipping costs that could be included (SOF ¶ 6). Thus, by the time AMS obtained the November 2011 transportation services addressed by payment approval requests T007, T008, and T009, the plain language of section 3.45 and the Purchasing Guide authorized reimbursement of AMS' shipping costs, with no exceptions for shipments to maintenance sites in Afghanistan.

The government concedes that section 3.45 dictated that AMS' shipping costs to its Afghanistan warehouse were reimbursable. Nevertheless, it claims the contract excluded reimbursement for shipping costs within Afghanistan to the maintenance sites. The government relies upon the original PWS's section 3.23.1.8. That section required AMS to "[m]anage a repair parts warehouse to include distribution of repair parts" (SOF ¶ 3). Whatever that requirement may have meant, it was deleted by the 20 April 2011 revised PWS and did not apply to AMS' November 2011 payment requests (SOF ¶ 4).

The government also contends that section 3.45's heading, "PARTS PROCUREMENT," governs here. It suggests the word "procurement" defined the scope of the reimbursement owed. It argues AMS' procurement was complete once parts were received in its warehouse. A contract's section headings cannot limit the plain language of its text. They "are of use only when they shed light on some ambiguous word or phrase." *Brotherhood of R.R. Trainmen v. Baltimore & Ohio R. Co.*, 331 U.S. 519, 528-29 (1947); *Glenn v. Am. United Life Ins. Co.*, No. 7:12-CV-03691, 2014 WL 3895429, at *9 n.5 (N.D. Ala. Aug. 8, 2014), *aff'd*, 604 F. App'x 893 (11th Cir. 2015). Section 3.45's requirement that AMS "consider freight and/or delivery fees when evaluating prices" contained no ambiguity, and did not limit the freight or delivery fees merely to those incurred shipping to the warehouse. Nor did the Purchasing Guide's declaration that "[d]elivery and shipping costs" were to be "considered a cost associated to the parts purchase" contain any ambiguity. Accordingly, section 3.45's reference to "procurement" in its title did not limit the plain language of its text.

Finally, the government relies heavily upon section 3.43, maintaining that its requirement for a "supply chain management program [that] shall include a viable distribution program for repair parts to each maintenance site," could only mean that AMS was to distribute repair parts. The government says the next sentence's mandate that "[a]ll costs of providing the warehouse facility as well as the management and

7

personnel portion of this requirement shall be a firm-fixed price," dictated the cost of shipping to the maintenance sites fell under the contract's firm-fixed-price line item. (SOF ¶ 3)

Section 3.43 did not address shipping costs. Section 3.43 sought a "commercially available supply chain management system" that was "fully transferable to the Afghanistan Government" (SOF ¶ 3). "Management," in relevant part is "the act or art of managing," or "the conducting or supervising of something (as a business)." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1372 (1986). Section 3.43 therefore sought a commercially available and transferable system for supervising the parts supply chain. The parties agree that the management system was a computer software package (tr. 1/15-18, 43-44). In addition to requiring AMS to manage a warehouse and operate a parts procurement program, the requirement that "[t]he supply chain management program shall include a viable distribution program for repair parts to each maintenance site," provided a further description of the supervisory actions sought from the software program (SOF ¶ 3). Accordingly, it was not the actual cost of shipping parts to each maintenance site that section 3.43 included within the firm-fixed-price effort, it was the cost of providing a commercially available and transferable supply chain management system (computer program) that, among other things, supervised the distribution of repair parts.

In summary, section 3.43 required a supply chain management program that, among other things, supervised the distribution of repair parts. Section 3.45 governed cost-reimbursable parts procurement and expressly required AMS to "consider freight and/or delivery fees when evaluating prices," without restrictions. The Purchasing Guide clearly stated "[d]elivery and shipping costs" were to be "considered a cost associated to the part purchase," with no exclusion for shipments to the maintenance sites. Considering these provisions together, the plain language of the contract entitled AMS to reimbursement for its costs of shipping parts within Afghanistan, which is exactly what the government approved for the first ten months of contract performance (SOF ¶ 5). Given the contract's terms, the government lacked any grounds to end that practice.

8

## CONCLUSION

Appellant's motion for summary judgment is granted and the government's motion is denied. The appeal with respect to entitlement is sustained. The appeal is remanded to the parties to negotiate quantum consistent with this decision.

Dated: 21 September 2015

MARK A. MELNICK
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 58352, Appeal of Automotive Management Services FZE, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

9