ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| H2L1-CSC, JV | )　ASBCA No. 62086 |
| | ) |
| Under Contract No. W912QR-14-D-0012 | ) |

APPEARANCE FOR THE APPELLANT:　　　Bernard Mandel, Esq.
　　　　　　　　　　　　　　　　　　　Cleveland, OH

APPEARANCES FOR THE GOVERNMENT:　　Michael P. Goodman, Esq.
　　　　　　　　　　　　　　　　　　　Engineer Chief Trial Attorney
　　　　　　　　　　　　　　　　　　　Carlton A. Arnold, Esq.
　　　　　　　　　　　　　　　　　　　Engineer Trial Attorney
　　　　　　　　　　　　　　　　　　　U.S. Army Engineer District, Louisville

OPINION BY ADMINISTRATIVE JUDGE PROUTY[1]

The issue before us in the government's pending motion for summary judgment is a relatively straightforward one of contract interpretation: did the task order (TO 9) at issue on the above-captioned contract (the contract) require the removal and replacement of gutters and downspouts on two roofs that were required to be replaced, even though this requirement was not expressly stated in the synopsized "Scope of Work" attached to TO 9, but was included – very plainly – in the specifications and drawings also attached to that task order? Because we find that TO 9 required the removal and replacement of the gutters and did not conflict with the Scope of Work, we rule in favor of the government and deny the appeal.

STATEMENT OF FACTS FOR PURPOSES OF THE MOTION

I.　Preliminaries

On April 15, 2014, appellant, H2L1-CSC, JV (H-C), was one of several contractors awarded the contract, which was a multiple award task order contract (MATOC), for design/build construction in the area under the jurisdiction of the Louisville District of the United States Army Corps of Engineers (the Corps) (R4, tab 3). The contract worked like other MATOCs: When the Corps decided it wished to have work performed under the contract, it would issue a solicitation for performance of the project as a task order (TO) to H-C and the other MATOC awardees. Those contractors would, in turn, submit bids on the TO under the MATOC. The Corps would then

---

[1] This appeal was recently re-assigned to Judge Prouty to draft the decision of the Board.

consider the bids and award the TO as a firm-fixed-price contract based upon its evaluation of the various bids.  (R4, tab 3 at 5)

## II. TO 9 is Solicited and Awarded to H-C

In April 2014, Ivory Associates, roofing and waterproofing consultants, submitted a report to authorities at Westover Air Reserve Base (ARB) in Massachusetts regarding the condition of the roofs of five different buildings that it had surveyed on the base (R4, tab 4 at 152-58).  The report made various recommendations for each of the five buildings.  For the two buildings that (as will be seen) are the subject of this dispute – Buildings 2200 and 2201 – the report recommended very different actions.  For Building 2200, the report found "only maintenance issues, at this time" (*id*. at 153-54).  For Building 2201, on the other hand, the report recommended replacing the roof "as soon as possible" (*id*. at 154-55).  It made no comment on the gutters of either Building 2200 or Building 2201 (*id*. at 153-55).  For one of the other three buildings inspected, Building 5200, the report did recommend the replacement of the gutters (*id*. at 152).

Regardless of the report's recommendations, the government decided to replace the roofs for both Building 2200 and Building 2201 and issued a solicitation under the contract to do so on August 25, 2014 (R4, tab 4 at 1).  On September 30, 2014, TO 9 was awarded to H-C (*id*. at 2).  According to a document attached to H-C's opposition to the government's motion for summary judgment, at about the same time, a different TO was awarded to a different contractor on the MATOC to replace the roof on another building at Westover ARB (Building 5200 – the one that the Ivory Associates report recommended replacing the gutters) (*see* app. opp'n, ex. B).

## III. The Contents of TO 9

### A. Preliminary Sections

The second page of TO 9 includes contract line item number (CLIN) 0001, which is, in fact, the only CLIN in TO 9.  Before devolving into payment bond matters and subjects of even less interest to us today, it provided the following:

> Roof Replacement of B2200 and B2201
>
> FFP
>
> Includes Demolition, Insulation and Remainder of work for Building 2200 and 2201. . . .
>
> Award is for the Roof Replacement, Building B2200 and B2201, located at Westover ARB, MA.  Contractor shall

2

provide all labor, equipment, supplies and construction services in accordance with all drawings, specifications and amendments 0001, and their proposal dated 23 September 2014.

(R4, tab 4 at 3)  After the price break-out schedule (*see* R4, tab 4 at 4) and a number of contract clauses from the Federal Acquisition Regulation (FAR) reproduced in full (*see* R4, tab 4 at 6-9), TO 9 reproduced the Department of Defense Supplement to the Federal Acquisition Regulation (DFARS) 252.236-7001, Contract Drawings and Specifications. Notably, in subsection (b), this DFARS provision requires the contractor to check contract drawings immediately upon their receipt and notify the contracting officer (CO) of any discrepancies therein.  Subsection (e) provides that "[t]he work shall conform to the specifications and the contract drawings identified on the following index of drawings:  Drawings are included in the Technical Specifications."  (R4, tab 4 at 10)  We will get to the specifications shortly.

    B.    The "Scope of Work"

    Appendix A to TO 9 spans pages 11 through 37 of tab 4 of the Rule 4 file.  It is labelled as "Scope of Work"[2] (R4, tab 4 at 11).  Most of it consists of standard contract provisions, some of which were already provided in the contract.  For example, it reproduces DFARS 252.236-7001, Contract Drawings and Specifications (*see* R4, tab 4 at 36-37), which, as we have already noted, was reproduced earlier in TO 9.  Little of its 27 pages provides any guidance on the substance of the work that is to be accomplished.

    The first page of Appendix A is labelled as "Task Order Scope of Work for Westover ARB Roof Replacement at Building [sic.] 2200 and 2201."  It further provides on the same page under "General Information" that, "[t]his Scope of Work covers Re Roofing projects at facilities located at Westover ARB in Westover, MA."  (R4, tab 4 at 11).  Section 1.1, Pre-Bid Site Visit, explained that there would be no pre-bid site visits, but that the contractor would be provided "inspection reports and facility specific specifications with roof plans and specific details for each roof condition" (*id.*).

    The only other portion of the "Scope of Work" detailing the work to be done (and "detailing" is perhaps too strong a word) is section 2.  The relevant portions are reproduced below:

---

[2] Most substantial government contracts include a "statement of work" and it is easy to see "scope of work" and read it as the same thing.  Indeed, perhaps it is meant that way here (we do not know), but the words are not the same.

2.  RE-ROOF PROJECT DATA

The Scope of Work (SOW) is for the construction services required to repair failed or failing roofs.  The roofs have been inspected by an independent contractor and specifications written for each roof type.  These specifications are included with this request for proposal.

2.1.  Locations

The contractor shall repair failed or failing roofs at the locations specified.

See Technical Specifications for details of the roof and summary of work to be performed at each building.

(R4, tab 4 at 13)  No other portion in the "Scope of Work" specifies further the actual work to be accomplished and it is bereft of such basic details as the type of roof to be installed.

C.  The Specifications and Drawings

As indicated above, both the preliminary portions of TO 9 and the language in the Scope of Work section referred the contractor to the specifications and drawings that accompanied it.  Indeed, there is such a section.  Page 38 of tab 4 of the Rule 4 file (TO 9), is a sheet with the words "Specifications for Westover Roof Replacement" above the words "Buildings 2200 and 2201" which, in turn are over an eagle insignia of some sort and the words "Guide Specifications Thermoplastic Membrane Roofing (Thermoplastic Polyolefin)."  The pages that follow, then, are TO 9's specifications, and the first is a table of contents, which takes us from "Section 01000 – General Requirements" through "Roof Details" (*id.* at 39).

1.  General Specifications

If we start at Section 01000, Part 1 General, and move to Section 1.2, Work Covered by Contract Documents, we see that in Subsection 1.2.A, "Project Identification," the project is identified as such:  "The project consists of roof replacement of Buildings 2200 and 2201 at Westover Air Force Base" (R4, tab 4 at 40).  Subsection 1.2.D. commands:  "Furnish all labor, materials, tools, equipment, devices, appliances, utilities, transportation, and other facilities and services necessary to accomplish the work described in these specifications" (*id.*).

Of relevance to H-C's allegations (which we will discuss shortly) that certain Corps employees agreed with H-C's interpretation of TO 9 (or perhaps acceded to it), Section 1.7, Oral Agreements, states, in no uncertain terms, that no oral agreement could modify the terms of the contract and, (underlined in the original), that: "none of the provisions of the Contract Documents shall be held to be waived or modified by reason of any act whatsoever, other than by an agreed to waiver or modification thereof in writing. All agreements and instructions must be in writing." (R4, tab 4 at 41)

### 2. Specifications Relevant to Gutters and Downspouts

For purposes of answering the question of whether TO 9 required replacement of gutters and downspouts, the preceding contract sections are important, but not immediately helpful. The next sections we discuss speak directly to the subject. Prime amongst them is the first we encounter.

Section 07000 of the TO 9 specifications, "REROOFING PREPARATION" provided straightforwardly in Part 3 Execution, Section 3.1 Removals, Subsection E: "Remove all existing gutters and downspouts and discard." (R4, tab 4 at 66)

Section 07620 of the specifications, "SHEET METAL FLASHING AND TRIM," included a Part 2, Products. Section 2.3 therein provided a schedule specifying the requirements for particular sheet metals to be used in the project. This materials schedule included gutters, which were to be 0.050 prefinished aluminum, and gutter liners, which were 18 ga. stainless steel. Downspouts were specified as 0.050 prefinished aluminum. (R4, tab 4 at 85-86)

Also part of Section 07620 of the specifications was Part 3, Execution. Section 3.12, in turn, is "Gutter Installation." In addition to specifying the means of gutter installation, this section began with Section A, which provided, "[r]eplace all gutters with new." (R4, tab 4 at 91) Section 3.13, "Downspout Installation," is similar, with its Section A providing "[r]eplace all existing down spouts with new" (R4, tab 4 at 91).

### 3. Contract Drawings Depicting Gutters and Downspouts

The contract drawings included those depicting the gutter, its size, its support, and how it was to be attached to the building (R4, tab 4 at 112). "Internal" gutters are also depicted in the drawings (*id*. at 122). Another drawing was labelled "Gutter/Downspout Detail" (*id*. at 129). Yet another detailed drawing was labeled "Gutter and Downspouts" (*id*. at 134). A drawing labelled "Gutter expansion joints," depicted just what it said it did (*id*. at 136).

5

The TO 9 package next moved to a section of "Record Drawings" (R4, tab 4 at 143). Although the "overall roof plan" for Building 2200 depicts "new gutter" in multiple locations (*id*. at 144) and so, too, does the "overall roof plan" for Building 2201 (*id*. at 145), the drawings are dated December 5, 1997, suggesting that they were for the prior roofing work done on the buildings.[3]

Next in the TO 9 package is the April 2014 Ivory Associates report on the state of roofs at Westover ARB (R4, tab 4 at 152-58). There followed an unidentified one-page document summarizing an inspection of Building 2200, dated June 12, 2013 which stated that the gutters "look[ed] good" (R4, tab 4 at 159). An aerial photograph of building 2200 follows on the next page. Underneath the photograph is text. The first paragraph (labelled 2.1) provided in relevant part, "The scope of work under this contract includes . . . the complete removal and disposal of the existing SBS modified bitumen roof system including . . . downspouts and gutters for Building 2200 at Westover Air Reserve Base." (R4, tab 4 at 160)

After a schematic drawing of the Building 2200 roof and its flaws (R4, tab 4 at 161) and a number of close up photographs of portions of the roof (*id*. at 162-63), there followed an unidentified one-page document, summarizing an inspection of the Building 2201 roof, dated June 12, 2013, and similar to the one described above for the Building 2200 roof. It likewise stated that the gutters "look[ed] good." (R4, tab 4 at 164) Yet again, an aerial photograph of a building – this time, Building 2201 – followed on the next page. Underneath the photograph was text almost identical to that for the photograph of Building 2200. The first paragraph (labelled 2.1) provided in relevant part, "The scope of work under this contract includes . . . the complete removal and disposal of the existing SBS modified bitumen roof system including . . . downspouts and gutters for Building 2201 at Westover Air Reserve Base." (R4, tab 4 at 165) We know that these photographs and their text were for the present project and not the one embraced by the 1997 drawings because they refer to the removal and replacement of a "bitumen roof system" (the asphalt type of roof) with a thermoplastic membrane roof (*id*. at 164-65) and the roofs that were being replaced in the TO 9 were not thermoplastic membrane roofs (as would be the case if that had been the plan in 1997), but the asphalt type (*see* R4, tab 4 at 44-45 (specifications reciting the type of roof to be found on Buildings 2200 and 2201); *id*. at 153-54 (Ivory and Associates report detailing the type of roof to be found on the two buildings)).

### 4. Roof Deck Issues

In its opposition to the government's motion, H-C alleges that the specifications include tasks that were not to be performed on Buildings 2200 and 2201, namely "Steel

---

[3] This would also be consistent with the notion of "record drawings" reflecting the way things were prior to the work required by TO 9.

Deck repair and poured concrete repair." Unfortunately, H-C failed to cite to where in TO 9 these specifications might be found. (App. opp'n at 9) This was unhelpful.

Nevertheless, we performed a search of the document and found citations to both steel deck repair and poured concrete repair in TO 9's specifications. Under Section 07000, REROOFING PREPARATION, Part 2, Products, included Subsection 2.2 for "Steel Deck Repair Materials." That subsection specified the particular materials to be used. (R4, tab 4 at 65)

In the same Section, 07000, Part 3, Execution, included Subsection 3.3, Deck Repair, which directed that the deck be inspected carefully and that if there are portions that need repair or replacement, to notify the Contracting Officer's Representative first and obtain permission (R4, tab 4 at 67). Subsection 3.4 described the means to be used for repairing wood decks (*id.*), Subsection 3.5 described the means to be used for repairing steel decks (*id.* at 67-68), and Subsection 3.6 described the means to be used for repairing poured (concrete) decks (*id.* at 68).

Steel decks were also mentioned in the Execution Part in Subsection 3.9 on Abandoned Curb Removal, which explained what to do in the circumstances in which an abandoned curb that covered a concrete deck were removed (Subsection 3.9 C.) and when the removed curb covered a steel deck (Subsection 3.9 D.) (R4, tab 4 at 69).

Specification Section 07540, THERMOPLASTIC MEMBRANE ROOFING (R4, tab 4 at 71) is the last place we see reference to steel decks in the TO 9 specifications. Part 3, Execution, Subsection 3.1.A of this specification, included a table reflecting the different layers of the roof for Buildings 2200 and 2201. On top of the unspecified type of "deck," for each, it stated that there is a "Gypsum Underlayment (steel deck only)" followed by the other various layers of the roof (*id.* at 76). Subsection 3.4 of this specification directed Vapor/Air Barrier installation where there were steel decks (*id.* at 77). And finally, Subsection 3.5 went into great detail, with 30 subsections, on how to install insulation on the roof, with just two subsections (3.5 D and 3.5M) addressing the means of installing it on a steel deck (*id.* at 78-79).

The only place we found "poured deck" mentioned was the "Poured Deck Repair" section adjoining the "Steel Deck Repair," Section 3.6, which was described above.

We found no portion of TO 9 (much less, any place directed to us by H-C) that specifically required that steel deck or poured deck be repaired or installed; rather, all mentions of those types of deck explained what the contractor was to do if it encountered a damaged steel or poured deck and what steps should be taken in installation of the roof if it rested upon the various varieties of deck, including steel and poured concrete.

7

IV.  The Issue of Gutters and Downspouts Arises During Performance

As noted above, TO 9 was awarded on September 30, 2014; the notice to proceed was issued by the government on November 3, 2014 (R4, tab 5).  H-C encountered a differing site condition in March 2015 involving the type of decking underneath the roof,[4] which would affect the means of attaching insulation (app. supp. R4, tab 5), and which caused the government to temporarily suspend work on the project and request a proposal to address it (app. supp. R4, tab 7 at 1).  On December 7, 2015, H-C provided a proposal to the government as a solution for attaching the insulation, in light of the original design assuming the wrong type of decking.  This proposal included an increase in the contract price by $82,061.13 and a time extension on the contract.  (App. supp. R4, tab 9)[5]  H-C alleges that this correspondence demonstrates that it was not planning on removing and replacing gutters and downspouts (app. opp'n at 16), but we have carefully reviewed the five sheets attached to H-C's proposal and find that, even giving all benefit of the doubt to H-C, they do not set forth the work to be done in sufficient detail for a reader to recognize that no gutter or downspout work was to be performed.  They are, instead, merely about the extra work to be performed in attaching the insulation to the different deck encountered and cover the extra material costs that change would entail – the whole point of this proposal (app. supp. R4, tab 9 at 2-6).  Indeed, these sheets may be contrasted with the far more detailed submittals made by H-C in July 2016 *for the entire project*, in which "gutters and DS" (presumably downspouts) are noted as a specified contract activity along with the provision for "Finishing Details/Metal Edges" (R4, tab 16 at 13 (for Building 2200); *id*. at 14 (for Building 2201)).

In any event, according to H-C's response to the government's motion for summary judgment, the first time[6] a controversy arose relating to the gutters and downspouts was in the "initial preparatory meeting" on August 1, 2016 (app. opp'n at 14).  In the contractor-created "Quality Control Report (QCR) Daily Log of Construction" dated August 1, 2016, the author wrote, among other things:  "— Discussed scope of work.  — Explained gutters are not included in Job." (R4, tab 6 at 1)  Given the authorship of the document and the context, we read this document to report that the government raised the issue of the scope

---

[4] It was not an issue involving steel or poured concrete.

[5] H-C's brief attaches this document as exhibit D, but it is generally better practice to refer to documents which appear in the Rule 4 file in the record location.

[6] In some of H-C's pre-claim correspondence, it alleged that the Corps project designer had communicated, at some time earlier, that he had not intended the gutters and downspouts to be removed (*e.g.*, R4, tab 9 at 1, R4, tab 15 at 15).  The CO took issue with that in his response to the pre-claim request for equitable adjustment, explaining his view of how the alleged meeting could not have taken place (*see* R4, tab 16 at 3) and H-C does not appear to be advancing that allegation further in its response to the government's present motion.

8

of work and it was H-C that "explained" that the gutters were not required. That is also how H-C characterizes it in its motion response (app. opp'n at 14).

The record is silent as to the government's direct response, if any, to this report. In any event, on August 16, 2016, the Corps Project Engineer, Michelle O'Donoghue, who was apparently out of town when the August 1 conversation took place, wrote an email to Latham Gray (H-C's "Director" of the project) advising him that, contrary to what his on-site personnel had stated to Corps personnel (presumably at the August 1, 2016 meeting), TO 9 required removal and replacement of the gutters and downspouts. She attached provisions of the specifications to underscore the point. (R4, tab 7)

On August 18, Mr. Gray responded to Ms. O'Donoghue in an email forwarding the response of his on-site subcontractor, arguing that the specifications did not require removal and replacement of gutters and downspouts (R4, tab 9 at 1-2). Ms. O'Donoghue responded the next day, directing that Mr. Gray submit an RFI (request for information) on the subject (*id*. at 1).

On August 24, 2016, Mr. Gray submitted a formal RFI to Ms. O'Donoghue, making similar arguments as before, that H-C was not required to replace the gutters and downspouts, but that it would "clean and repair [them] as required" (R4, tab 11). The government received the RFI on August 25, 2016 and issued its response on August 31, 2016 (*id.*). The response was a three-page letter, dated August 29, 2016, and signed by Raymond Goff, the Administrative Contracting Officer. Mr. Goff's letter cited the specifications of TO 9 in support of his contention that H-C was contractually required to remove and replace the gutters and downspouts and closed by directing H-C to perform that work at no additional cost to the government. (R4, tab 12)

On March 28, 2017, H-C submitted to Wesley Barber, the Administrative Contracting Officer,[7] a document labelled as a request for equitable adjustment (REA) for the additional work involving the gutters and downspouts. The REA sought $225,472.01 in increased costs due to the gutter installation and an additional 92 days for completion of the job (R4, tab 15). Mr. Barber denied the REA in a letter dated April 3, 2017 (R4, tab 16).

On November 8, 2018, H-C requested a contracting officer's final decision regarding the gutters and downspouts. The request sought the same $225,472.01 requested in the REA and 93 days of delay.[8] (R4, tab 2) The contracting officer,

---

[7] The record does not indicate what happened to Mr. Goff or when Mr. Barber assumed that role. In the end, it does not matter.

[8] As noted earlier, the REA sought 92 days. The record does not account for the one-day change.

Christopher Brackett, denied the claim in a letter dated April 30, 2019 (R4, tab 1). H-C submitted a timely appeal to the Board.

DECISION

The government's motion for summary judgment rests on the simple premise that the terms of TO 9 require removal and replacement of the gutters and downspouts (gov't mot. passim).[9] H-C's response seeks to create ambiguity. It argues that the Scope of Work's failure to mention gutter removal conflicts with any contractual requirement requiring such work (app. opp'n at 5). Moreover, it also argues that extrinsic evidence, namely the contents of the Scope of Work for a different task order for roof work on a different building on Westover ARB (Building 5200) (*see* app. opp'n at 4); the Ivory Associates report's failure to recommend replacement of gutters and downspout for the two buildings at issue (*see* app. opp'n at 12-13); and the government's alleged acquiescence, during the August 1, 2016 meeting, to H-C's decision to forego gutter and downspout work is also seen as proof of ambiguity (app. opp'n at 14-15). H-C's arguments are unpersuasive.

## I. The Standard of Review for a Motion for Summary Judgment

The standards for summary judgment are well established. Summary judgment should be granted if it has been shown that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A non-movant seeking to defeat summary judgment by suggesting conflicting facts "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)). Nevertheless, "[t]he moving party bears the burden of establishing the absence of any genuine issue of material fact and all significant doubt over factual issues must be resolved in favor of the party opposing summary judgment." *Mingus Constructors v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## II. TO 9 Required Removal and Replacement of the Gutters and Downspouts

### A. We Rely on the Text of the Contract When it is Unambiguous

Like the standards for summary judgment, the law governing contract interpretation is well worn. Under basic principles of the law, a contract is interpreted "in

---

[9] The government also seeks dismissal of H-C's requests for consequential damages and attorney fees, but we need not address those because we rule on the larger entitlement issue.

terms of the parties' intent, as revealed by language and circumstance." *United States v. Winstar Corp.*, 518 U.S. 839, 911 (1996) (citations omitted). Generally, this process begins and ends with the language of the contract. *TEG-Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006). And in reviewing this language, the Board should read the contract "as a whole and [interpret it] to harmonize and give reasonable meaning to all its parts," if possible, leaving no words "useless, inexplicable, inoperative, insignificant, void, meaningless or superfluous." *Precision Dynamics, Inc.*, ASBCA No. 50519, 05-2 BCA ¶ 33,071 at 163,922 (citations omitted); *see also Hercules, Inc. v. United States*, 292 F.3d 1378, 1381 (Fed. Cir. 2002) ("contract must be construed to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract"); *Hunkin Conkey Constr. Co. v. United States*, 461 F.2d 1270 (Ct. Cl. 1972) (rejecting contract interpretation that would render a clause in the contract meaningless).

If a contract provision is "susceptible to more than one reasonable interpretation, it is ambiguous." *TEG-Paradigm*, 465 F.3d at 1338 (citing *Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed. Cir. 1986)).

### B. The Terms of TO 9 are Unambiguous

#### 1. They Explicitly Require Replacement of Gutters and Downspouts for Buildings 2200 and 2201

As noted above, in very plain English, Section 07000 of TO 9's specifications (specifications particular, according to their cover sheet, to Buildings 2200 and 2201), "REROOFING PREPARATION" directs, in Section 3.1 E., that the gutters and downspouts would be removed and disposed of. Likewise, Section 07620 of TO 9's specifications, "SHEET METAL FLASHING AND TRIM" provides, in Section 3.12.A, for the replacement of "all gutters with new." It says the exact same thing for downspouts in Section 3.13.A. This is not susceptible to more than one meaning; it is not the stuff of ambiguity. And it is enough for us to find that gutter and downspout removal and replacement is required by TO 9. But there is more.

As would be expected, as discussed above, the Specifications and Drawings specify the materials to be used for replacing the gutters and downspouts and how they were to be used. To our eye, TO 9 includes everything necessary for a contractor to remove and replace the gutters and downspouts.

Moreover, the written specifications are not the only part of the TO 9 package that make clear that gutters and downspouts were to be replaced. The text underneath the aerial photographs of the two buildings specify the removal and replacement of the gutters and downspouts.

11

2. The Specifications do not Contradict the Language of the Scope of Work

The argument that the Scope of Work is inconsistent with the specifications is not persuasive. H-C argues that, since it makes no mention of the gutters and downspouts, the Scope of Work affirmatively indicates that the work is not required (app. opp'n at 4). Not so much. The synopsis of work placed in the Scope of Work merely referred to the project as the "re-roofing" project and stated that the contractor would repair failed or failing roofs.[10] Critically, it directed the contractor to the specifications to see what this direction really meant. No reasonable contractor would read the few substantive words of the Scope of Work as representing a comprehensive statement of the work required by TO 9; by the same token, the Spartan nature of the project description in the Scope of Work would preclude the reader from finding that an omission of particular requirements by the Scope of Work was meant to be an affirmative representation that complying with the requirements was unnecessary.

Of course, when we read TO 9 as a whole, giving meaning to all of its parts, as preferred by the law, it is trivially easy to reconcile the thumbnail sketch of the project in the Scope of Work with the more detailed directives in the specifications: the lion's share of the work was, in fact, to remove and replace the roofs,[11] and this was mentioned in the Scope of Work, and that Scope of Work referenced the specifications for more details, including the removal and replacement of the gutters.

What is impossible to reconcile is H-C's proffered interpretation of the contract, in which the Scope of Work's lack of detail is read as an affirmative statement that no gutter and downspout replacement is required, notwithstanding the affirmative commands contained in the written specifications and the text with the photographs. H-C's proposed interpretation also runs afoul of the contract provisions addressed above, such as CLIN 0001 directing the contractor to act in accordance with the plans and specifications and DFARS 252.236-7001, which requires the contractor to not only comply with the plans and specifications, but to notify the CO of any discrepancies within them.

---

[10] Of course, we know that the roofs were not merely to be repaired, but were to be replaced (as directed in the specifications) – an issue that H-C does not claim to have been misled about.

[11] Hence, H-C's argument (unsupported by evidence) that, as used in the trade, roof replacement did not require gutter and downspout replacement (app. opp'n at 6), is immaterial. We agree that requiring replacement of a roof does not necessarily require replacement of gutters and downspouts, but that does not preclude the government from separately requiring it as part of a larger job.

### 3. Reference to Steel and Poured Decks Does not Create Ambiguity

H-C advances a narrative that the specifications requiring removal and replacement of the gutters and downspouts were generic ones, attached to all roofing projects at Westover ARB and not meant to be complied with (app. opp'n at 9). In support of this argument, it points to two other provisions in TO 9 that it alleges weren't required for Buildings 2200 and 2201: Steel Deck and Poured Deck repair (*id.*). The argument fails.

First, we note that H-C has presented no evidence that the steel deck and poured deck provisions were actually inapplicable to TO 9 (*see* app. opp'n at 9). It is a mere assertion of counsel in his brief which does not constitute evidence in any circumstance, including in an opposition to a motion for summary judgment. H-C does attach an affidavit to its opposition, by Mr. Gray, the Director of the project for H-C. Mr. Gray's affidavit states that he has read H-C's brief and that all the facts contained in it are true to the best of his knowledge.[12] He doesn't identify any particular facts that he is averring to be true; nor does he specify the basis for his knowledge of any particular facts. It is a blanket statement that his company's lawyer got everything factually correct in his 17-page opposition. (*See* app. opp'n, ex. E) This will not fly.

It is the Board's practice to look to Federal Rule of Civil Procedure 56 for guidance when it considers motions for summary judgment. Board Rule 7(c)(2). On the subject of affidavits, Fed. R. Civ. P. 56(c)(4) provides:

> An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matter stated.

It is impossible to do more than guess what the bases might be of Mr. Gray's agreement's with the "facts" set out in H-C's filing. Yes, he was the "Director of the project," but it appears that he was not on-site, given statements in Ms. O'Donoghue's correspondence with him. How does he know what he purports to know? The affidavit, never bothering to specify which actual facts he is testifying to, takes even less care in linking such facts to Mr. Gray's personal knowledge. We are also left speculating upon the potential admissibility into evidence of these "facts" given how amorphous they are. As the United States Court of Appeals for the Fifth Circuit stated in a case involving expert affidavits,

---

[12] He also avers that the exhibits attached to the opposition to the motion (he does not identify how many there are or what they are) are all accurate copies of the documents that they purport to be. Though we may have our concerns about this portion of the statement, we need not make a finding on the matter.

13

but equally applicable here, "[t]here is a level of conclusoriness below which an affidavit must not sink if it is to provide the basis for a general issue of material fact." *Orthopedic & Sports Injury Clinic v. Wang Labs., Inc.*, 922 F.2d 220, 224 (5th Cir. 1991). We find that Mr. Gray's affidavit is insufficiently specific as to what he is swearing to and the particular bases of his knowledge to reach the level of raising issues of material fact.

Nevertheless, even if there were evidence that there were no steel or poured concrete decks to potentially repair on Buildings 2200 and 2201, the inclusion of provisions specifying how to do so would not call into question the requirement to remove and replace the gutters and downspouts. This is for the simple reason that TO 9 directly commands that the gutters and downspouts be removed and replaced, while the steel deck and poured deck provisions explain what the contractor is to do if it encounters damaged roof decking of those varieties.

To be sure, we interpret contracts to avoid finding parts of them superfluous, but there is a marked difference between superfluous commands and superfluous instructions for potential contingencies. As we have recognized in other cases, the way that contracts are assembled often results in the CO's insertion of "boilerplate" language unnecessary for achievement of the contract purpose, such as material specifications for materials not actually used on the contract in question. *See Watts Constructors, LLC*, ASBCA No. 61493, 20-1 BCA ¶ 37,563 at 182,385-86. The steel and poured deck provisions explained what to do if these were encountered during roof replacement. Perhaps these turned out to be unnecessary, but the CO's providing for that contingency by issuing standard specifications on the matter is of very little moment. It certainly does not in any way illustrate that the direct commands to remove and replace the gutters and downspouts should be ignored.

### 4. The Ivory Associates Report Does not Create Ambiguity

Though the Ivory Associates report was provided with the TO 9 package, there is no basis to find that it is part of the contractual undertaking since no portion of TO 9 has been identified that directs H-C to act in accordance with any directive in that report. Moreover, it is very clear that H-C did not read the Ivory Associates report as delimiting the work required under TO 9: that report plainly recommended only maintenance on the roof of Building 2200, while H-C agrees that TO 9 directed its complete replacement – a far more significant departure (upwards) from the recommendations of the report than removing and replacing the gutters and downspouts on both buildings.[13]

---

[13] Such departures from what the government actually needs are, of course, perfectly within the government's right. It has long been held that the government "can engage a contractor to make snowmen in August, if [it spells] it out clearly." *Rixon Elec., Inc. v. United States*, 536 F.2d 1345, 1351 (Ct. Cl. 1976)

## C. Even if we Considered Extrinsic Evidence, we Would Still Find That TO 9 Required the Replacement of Gutters and Downspouts

As we have made clear, the contract is unambiguous as to the requirement to replace gutters and downspouts. It is black-letter law that we need not consider extrinsic evidence at this point and that, in fact, we should not. *TEG-Paradigm*, 465 F.3d at 1338. We note briefly here that even if we did consider the arguments proffered by H-C it would not change the results.

### 1. There is no Evidence Before us That the Intent of the Corps was not to Require Replacement of the Gutters and Downspouts

H-C argues that the intent of the Corps was to only require replacement of the gutters and downspouts for Building 5200 and that it simply issued identical specifications for all the buildings for which work was to be performed, regardless of what was actually required. There is no evidence for this except for counsel's conclusory statement, and even if it were adopted by Mr. Gray's affidavit – indeed, even those words had been typed in the affidavit that Mr. Gray signed – there is no evidentiary foundation for Mr. Gray to testify to this conclusion. Against this lack of evidence is the clear evidence in TO 9 – from the specifications specifically for Buildings 2200 and 2201 to the aerial photographs with the text specifying for each building that the downspouts and gutters would be replaced – that the specifications were, in fact, specific to the buildings covered by TO 9.

### 2. Other TO's Shed no Light on the Meaning of TO 9

Relatedly, H-C argues that the TO for the re-roofing of Building 5200 somehow proves that it was intended to cover the gutters and downspouts while TO 9 was not (*see* app. opp'n at 4). If anything, it demonstrates just the opposite. Notably, the Building 5200 TO did not mention the gutters and downspouts in the portion of the Scope of Work that H-C attached to its motion (*see* app. opp'n, ex. B). Hence, consideration of this document fatally undermines H-C's core argument that gutter and downspout replacement is the kind of thing that must be mentioned in the Scope of Work to be required. Obviously, it does not.

The portion of TOs that *is* different is in the specifications, Section 01000 GENERAL, Section 1.2, Work Covered by Contract Documents, Subsection A, Project Identification. In TO 9, the specifications included a single sentence, stating that "[t]he project consists of roof replacement of Buildings 2200 and 22201 at Westover Air Force Base." In the Building 5200 TO, the text consists of a single-spaced paragraph that covers more than half of the page and which details such things as the slope of the roof, the size of the panels that will replace it, items that will be left as they were, the type of

15

insulation that will be installed and the type of coating to be applied to the roof.  It also mentions the repair and replacement of certain gutters.  (*See* app. opp'n, ex. B)

The difference in level of detail between the two provisions in the different TOs makes it impossible to draw any conclusions by comparing the two.  But in the end, the key fact is that it was the specifications, not the Scope of Work, which required the removal and replacement of the gutters and downspouts in *both* TOs.

### 3. There is no Evidence that the Corps Agreed with H-C's Present Interpretation

Finally, neither H-C's December 2015 proposal regarding insulation application nor its August 1, 2016 meeting minutes provide any aid in interpreting the contract or any basis for finding that the government waived its obligation to remove and replace the gutters and downspouts.

First, factually, it is very clear that the December 2015 proposal for dealing with the insulation application differing site condition had no bearing on whether the rest of the TO 9 required replacement of the gutters and downspouts.  And H-C has presented no evidence, whatsoever, from which we could even infer that it was material to the issue at hand.

With respect to the August 1, 2016 meeting, even H-C does not allege that the Corps personnel present agreed with its interpretation of the contract, just that the Corps did not immediately challenge the meeting minutes.  That said, it is not particularly clear what H-C is asking us to do with this information.  If H-C's argument is that we should take this to mean that even Corps employees were persuaded by its interpretation of TO 9 so we should be, that is simply wrong:  we interpret an unambiguous contract based upon its terms, not upon how we infer that other persons interpreted it.  *See Watts Constructors*, 20-1 BCA ¶ 37,563 at 182,386 (opinion of government quality control inspector when the basis of that opinion is unexplained is unpersuasive).  Moreover, within two weeks of H-C expressing its view of the contract's meaning, Ms. O'Donoghue made quite clear that the Corps read the contract very differently.

If H-C is making a waiver argument (it never comes out and says that it is), that argument falters upon the fact that H-C has identified nobody with any authority to do so, actually waiving TO 9's requirements related to gutters and downspouts.  *See Watts Constructors*, 20-1 BCA ¶ 37,563 at 182,387 (waiver requires recognition of departure from contract terms and acceptance of that by person with authority to do so).  To the contrary, Ms. O'Donoghue acted quickly to disabuse H-C of the notion that any requirements were waived and the contract made clear that waiver of contract requirements could only be accomplished directly and in writing.

Because we find TO 9 to be unambiguous, we have no need to address the government's patent ambiguity argument or any of the other arguments for summary judgment in its favor contained in its motion.

CONCLUSION

The government's motion for summary judgment is granted. H-C's appeal is denied.

Dated: October 28, 2021

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I concur

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

MARK A. MELNICK
Administrative Judge
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 62086, Appeal of H2L1-CSC, JV, rendered in conformance with the Board's Charter.

Dated: October 28, 2021

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals